

JUDGE KAPLAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK **07 CV 6906**

------------------------------------------------------x

ATILIO ARELO

                 Plaintiff,

    -against-

BLOOMBERG L.P. AND THOMAS BOEKAMP, HANK
KELBAUGH, JAMES NIZIOLEK AND BENNY TRAMO,
INDIVIDUALLY, AND IN THEIR OFFICIAL CAPACITIES
AS EMPLOYEES OF BLOOMBERG LP,

              Defendants.

------------------------------------------------------x

**COMPLAINT**
(Jury Trial Demanded)



COMES NOW Plaintiff, Atilio Arelo ("**Arelo**"), by and through his undersigned

counsel, The Law Offices of Neal Brickman P.C., located at 317 Madison Avenue, New York,

New York 10017, and as and for his Complaint against Bloomberg LP ("**Bloomberg**"), Thomas

Boekamp ("**Boekamp**"), Hank Kelbaugh ("**Kelbaugh**"), James Niziolek ("**Niziolek**") and Benny

Tramo ("**Tramo**") (hereinafter collectively "**Defendants**" or "**defendants**") states and alleges as

follows:

## NATURE OF THE ACTION

1.    This is an action alleging discrimination and retaliation in violation of the

Americans' with Disabilities Act of 1990 ("**ADA**"), 42 U.S.C. § 12101 *et seq.*, Title VII of the

Civil Rights Act of 1964, ("**Title VII**"), 42 U.S.C. § 2000 *et seq*, as amended, the Age

Discrimination in Employment Act of 1967 ("**ADEA**"), 29 U.S.C. § 621, as well as applicable

New Jersey State Human Rights Laws.  Additionally, Plaintiff asserts common-law tort claims

for False Imprisonment, Intentional Infliction of Severe Emotional Distress and Civil Battery.

Arelo seeks compensatory and punitive damages, costs, relevant interest, and attorneys' fees for

these violations.

2.      Plaintiff maintains that, as a direct result of his ethnicity, his age and his status as a disabled person, he fell victim to a vicious campaign to "manage him out" of Bloomberg. The discriminatory disparate treatment escalated immediately following his complaints about discrimination, harassment and defendants' abject failure to accommodate his disability. When all attempts to force him out of the company failed, defendants opted to terminate Arelo's much-needed medical benefits and, ultimately, removed him from the payroll, falsely telling Plaintiff first that his position had been eliminated and later that he had been replaced.

3.      Specifically, Arelo alleges that defendants (1) tried to force him to quit by negatively altering his performance evaluation and slashing his compensation; (2) terrorized him by following him into the bathroom, peering at him through the gaps in the bathroom stalls and timing his bathroom breaks despite the fact that Arelo presented doctors' notes that detailed his problem of internal bleeding; (3) harassed him by following him to the cafeteria on lunch breaks, bumping into him in a threatening manner and circling his lunch station with a timer; (4) demoted him to a wholly-unrelated position to that for which he was hired which, for medical reasons, he could not perform; (5) repeatedly denied his requests for reasonable accommodation under the ADA by falsely reporting the duties of his position to his physicians; (6) contacted his wife during a family funeral to inform her that Arelo would be fired from his job for his failure to show up to work when he had *written* permission to attend the very same funeral; (7) assailed him with daily e-mails containing contrived negative criticism of his work and issued false negative performance reviews immediately following his complaints to HR about the disparate, harassing and inhuman treatment he was experiencing; (8) followed him to the hospital in unmarked "Bloomberg Security" vehicles after he was carried out on a stretcher as a result of an

harassing incident, obstructing the ambulance, his treatment and falsely intercepting phone calls to the hospital, claiming to be "friends" of Arelo, while falsely reporting to Arelo's family members that he was "fine" when his vital signs were in fact critical; (9) cancelled his medical benefits; and (10) terminated him after Bloomberg supposedly "eliminated" Arelo's position upon his return from short-term medical leave, despite defendant Tramo's disclosure that Arelo actually had been replaced in direct contravention of all applicable laws.

4.      Through such incomprehensible and despicable acts, defendants discriminated against Arelo by subjecting him to disparate harassing treatment, discriminatory overbearing supervision, disparate pay, as well as terror and abuse based on his status as a disabled person, his national origin, and his age. Further, defendants retaliated against Arelo for complaining about the illegal, discriminatory treatment he was experiencing through the creation of a hellish hostile work environment, pushing and bumping him in a threatening manner, watching him use the toilet and thus imprisoning him within the toilet stalls, calling his family members at home, improperly following him to the hospital, cancelling his benefits and, ultimately, terminating him. Finally, such maniacal bullying of a 59 year-old, disabled man, as well as its consequent physical manifestations, is sufficiently outrageous so as to state a claim for and infliction of severe emotional distress upon the Plaintiff.

## PARTIES

5.      Atilio Arelo is, and was at all times relevant hereto, a Citizen of the State of New Jersey, residing at 47 Longview Avenue, Lake Hiawatha, New Jersey, 07034. Arelo is a 59 year-old Latin American man with a severe disease, specifically, Coronary Artery Disease ("CAD") and Arterial Sclerosis. As such, Arelo qualifies as an individual with a "disability"

3

within the meaning of the ADA.

6.     Upon information and belief, Defendant Bloomberg is a Delaware Limited Partnership with its principal place of business located in New York City. It is duly authorized to conduct business in the State of New York and subject to the laws and statutes thereof.

7.     Upon information and belief, Defendant Thomas Boekamp is, and was, at all times relevant hereto, a resident of the State of Pennsylvania. Boekamp served as Arelo's manager while Arelo was employed as a Translator by Bloomberg in its Global Data division. Additionally, Boekamp individually aided, abetted, assisted and/or encouraged the discriminatory and/or retaliatory conduct at issue in this case and hence qualifies for individual liability under N.J.S.A. 10:5-12e of the by virtue of his aiding and abetting of the discriminatory and retaliatory acts alleged.

8.     Upon information and belief, Defendant Hank Kelbaugh is, and was, at all times relevant hereto, a resident of the State of New Jersey. Kelbaugh served as the senior Manager to whom Defendant Boekamp reported directly while Arelo was employed as a Translator by Bloomberg in its Global Data division. Additionally, Kelbaugh individually aided, abetted, assisted and/or encouraged the discriminatory and/or retaliatory conduct at issue in this case and hence qualifies for individual liability under N.J.S.A. 10:5-12e by virtue of his aiding and abetting of the discriminatory and retaliatory acts alleged.

9.     Upon information and belief, Defendant Niziolek was, until his replacement by Benny Tramo in or around December of 2006, the Bloomberg Human Resources Representative who, among other things, was responsible for ensuring compliance with Title VII, the ADA, the ADEA as well as State Human Rights Laws. Niziolek individually aided, abetted, assisted

4

and/or encouraged the discriminatory and/or retaliatory conduct at issue in this case and hence qualifies for individual liability under N.J.S.A. 10:5-12e by virtue of his aiding and abetting of the discriminatory and retaliatory acts alleged.

10.     Upon information and belief, Defendant Tramo was, and is, the Human Resources Representative who replaced Defendant Niziolek, and who, thereafter, was responsible for ensuring compliance with Title VII, the ADA, the ADEA as well as State Human Rights Laws. Tramo individually aided, abetted, assisted and/or encouraged the discriminatory and/or retaliatory conduct at issue in this case and hence qualifies for individual liability under N.J.S.A. 10:5-12e by virtue of his aiding and abetting of the discriminatory and retaliatory acts alleged.

## JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that the claims herein arise under the laws of the United States, and in particular under the Americans' with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq.

12.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's common-law tort claims for False Imprisonment, Intentional Infliction of Severe Emotional Distress and Civil Battery, as well as those claims arising under New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 .

13.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because the defendant entity resides, for purposes of venue pursuant to 28 U.S.C. § 1391(c), in this judicial district.

5

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.    On or about July 24, 2006, well within the mandated 300-day period, the Plaintiff filed a charge with the EEOC alleging that he was the victim of illegal discrimination and retaliation and that his rights under the ADA, the ADEA and Title VII of the Civil Rights Act of 1964 had been violated. On or about June 19, 2007, Plaintiff received, at his specific request, a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC") in connection with this charge. This action is filed within ninety (90) days of plaintiff's receipt of said Notice of Right to Sue from the EEOC. (A copy of the right to sue letter is attached hereto and made a part hereof as **Exhibit A.**)

## FACTUAL STATEMENT

15.    On or about January 2, 2001, Arelo was hired by Bloomberg as a Portuguese translator. Arelo came to the position with more than thirty (30) years of experience as translator, specializing in legal translations in the Portuguese and Spanish languages.

16.    The decision to hire Arelo, however, was not based solely upon his self-reported past achievements, as reflected in his résumé. Immediately prior to his hire, Arelo was subjected to extensive testing and was told that he had performed unusually well on those tests, required no particular training and could begin work immediately. Although Arelo expressed some apprehension at the fact that Bloomberg was a known technology company and that he was unfamiliar with computers, he was reassured by his supervisor, Marcia Pedroso, that, based on his test scores alone, he was perfectly capable of performing the substance of the work, and would be trained on the Bloomberg system.

17.    From 2001-2003, Arelo's performance was undisputedly successful. Like all

6

Bloomberg employees, he was reviewed annually in the ordinary course of business. The reviews from the 2001-2002 and the 2002-2003 periods were, and remain, uniformly positive. It is noteworthy that, during this period, Arelo was supervised and reviewed by individuals familiar with the languages Arelo translated and, hence, they were able to pass judgment on the quality of his work.

18.     During the 2001-2003 period, Arelo occasionally took health-related absences for purposes of receiving treatment for his heart condition, but always made up the time that he missed from work by putting in extra hours.

19.     But Bloomberg's disdain and contempt for older workers who require medical treatment could no more be overstated than repressed. In or around September of 2003, Bloomberg replaced Arelo's Latin American supervisor with a Caucasian individual of German ethnicity and descent, Defendant Thomas Boekamp, who admittedly had no knowledge of the languages Arelo translated. Nevertheless, Boekamp immediately began his campaign to "manage him out" of the company.

20.     On or about January 26, 2004, Boekamp presented Arelo with his performance review for the prior year. To Arelo's surprise, it was overwhelmingly negative, did not take into account any of Arelo's achievements for the period, failed to award Arelo any semblance of a cost-of-living raise (the standard minimum given at Bloomberg), and also affirmatively slashed his equity equivalency certificates ("Certs" or "EECs") by 50%.[1]

---

[1]In order to freely demote, disparately compensate and perpetuate other adverse employment actions upon its employees, while maintaining that a particular victimized individual never experienced a "pay" cut, Bloomberg, despite its organizational structure as a partnership, compensates its employees using what purports to be a stock bonus scheme, subject to a 2-year vesting period, utilizing what are called "equity-equivalency certificates." It is not uncommon for employees to make the majority of his or her income in EECs only to have that income taken away at the whim of one of Bloomberg's hand-picked cronies on the eve of their vesting during one of the company's frequent management coups.

7

21.    Astonished, Arelo questioned Boekamp about this sudden and inexplicable downward spiral in performance. Boekamp stated, in sum or substance, that he did not write the review; that the review was written by Arelo's supervisor, Marcia Pedroso; and that Arelo should speak to Pedroso if he had questions or concerns.

22.    Arelo immediately confronted Pedroso, who informed Arelo that Boekamp had instructed her to alter the review she had initially written and that she retained copies of both because "it wasn't right." Pedroso opened her folder and showed Arelo both the original and the altered copy of the performance evaluation.

23.    On or about February 8, 2004, Arelo attempted to make peace with Boekamp by asking him for some guidance as to how he preferred the translated data to be uploaded onto the Bloomberg system. Boekamp quipped, "how stupid can you possibly be."

24.    Following the February 2004 incident, Arelo redoubled his efforts and attempted to do his job in peace, fearing Boekamp. Unable to criticize Arelo's work, Boekamp instead focused on Arelo's personal habits, remarking that Arelo took frequent bathroom breaks, which were purported to exceed acceptable limits.

25.    Arelo explained to Boekamp that, as a result of his heart condition and the medication he was taking, he suffered from internal bleeding, a circumstance confirmed in writing by his physician. Arelo also made the mistake of informing Boekamp that the internal bleeding was exacerbated by elevated stress levels.

26.    As a result, from May 2004 until approximately September of 2005, Boekamp began following Arelo into the bathroom and timing his bathroom breaks, looking into the toilet stalls through the gaps between the doors while Arelo was seated inside but, significantly, never

8

using the facilities himself during his bizarre discriminatory and, frankly, reprehensible, inspections.

27.    Mortified and afraid, Arelo froze in his place and did not feel he could either continue or exit the toilet stall after being watched in such a fashion. Arelo would then be admonished for taking unreasonably long bathroom breaks. He demanded to know why Boekamp peered through the bathroom stalls and was told that it was necessary to ensure that someone was seated inside. However, Arelo explained that the door was locked and, as such, it was self-evident that the stall was occupied. Upon further reflection, Boekamp amended his explanation, stating that, as his manager, he needed to know whether it was Arelo, as opposed to another worker, who was seated therein. Boekamp, however, managed to avoid acting in such a manner when supervising other non-disabled, younger employees.

28.    Arelo brought this despicable conduct to the attention of Human Resources. After performing an "investigation," Gina Gibbons, of Human Resources, reported to Arelo that what Boekamp was doing was perfectly acceptable and remarked "how else can you tell if someone is inside the stall?"[2]

29.    In response to Arelo's complaints, Boekamp, as bullies will when supported by management, stepped up his harassment, and began to follow Arelo to the cafeteria during his lunch hour, repeatedly bumping shoulders with him in a threatening manner, while circling around Arelo while he ate, with a hand timer clearly visible.

30.    On or about May 4, 2004, Arelo went to the one of the copy machines in the

---

[2] Common sense and experience dictate, however, that the application of slight pressure to the door of the stall usually indicates whether the door is locked -- a fair indication of whether someone is inside. Alternative, less-invasive and more traditional methods such as knocking, were bypassed by Boekamp in favor of spying, harassment, and wholly unwarranted conduct. That Boekamp needed to know the identity of the individual seated inside is itself bizarre and inexplicable and such conducts warrants, at the very least, a clear and concise explanation to this Court.

9

office, where he encountered Boekamp making copies. When Boekamp had finished, Arelo raised the cover of the machine in order to make his own copies, but discovered, to his surprise and dismay, a log of Arelo's bathroom and lunch breaks, with a time indication for each. Noteworthy is the fact that Arelo's lunches were within the allotted time frame. Arelo took the log home for safekeeping.

31.    On or about March 22, 2005, Arelo was called into Bloomberg's Human Resources department ("**Human Resources**") and berated for his supposed poor performance and excessive bathroom breaks. Boekamp screamed repeatedly that Arelo's performance was unacceptable and that he would lose his job. Arelo's blood pressure suddenly skyrocketed to the outer Stage II limit, he collapsed with chest pains and was rushed to the hospital.

32.    Shortly thereafter, on or about May 23, 2005, Arelo returned to work, but was again followed into the bathroom repeatedly by Boekamp. No matter how hard Arelo tried to avoid Boekamp by using other restrooms on other floors, Boekamp, who, by this time, had taken to calling Arelo's name upon entering the restroom, always tracked him down, seeming to enjoy the hunt in a perverse and obscene manner.

33.    On or about September 1, 2005, Arelo, in his own words, detailed Boekamp's continued depredations in a written complaint to Human Resources. Human Resources again repeated its mantra that Boekamp was entitled to know who was inside the toilet stalls and was within his rights to time Arelo's medically required breaks as his manager.

34.    In or around October of 2005, Boekamp, frustrated that Arelo would not voluntarily leave the company, decided to put Arelo in an accounting position. Arelo, a talented translator, but known to the company as a technologically and mathematically challenged

10

employee, was without rhyme or reason required to perform computerized balance sheet functions for Bloomberg's operations. Boekamp put Arelo on what he termed a "tight" training schedule with rigorous examinations and after-hours course work, in addition to his duties as a Portuguese translator. No additional compensation was offered for this work.

35.    Not surprisingly, Arelo experienced tremendous anxiety at the announcement of this new role as an accountant/translator, an unnatural fusion of positions that could only be rivaled by the great Dr. Frankenstein himself, and began experiencing severe, stress-related fluctuations in his blood pressure. Arelo sought a reasonable accommodation based on his disability and asked to be excused from accounting duties and restored to his position as translator, but was told that he must submit a physician's opinion. Arelo did so on or about November 21, 2005 and was temporarily relieved of the accounting duties, but given double translation work.

36.    But Bloomberg was not satisfied with the recommendations of Arelo's physician and, in response, sent no fewer than four (4) different questionnaires to Arelo's physician, each with a different job description and title, attempting to characterize Arelo as a "book keeper," a "data analyst" or some other position in order to further exacerbate work-related stress calculated to induce Arelo to quit his job; all what Bloomberg insiders refer to as "managing out" an employee. It should be noted that the duties listed on the job descriptions provided by the HR department of Bloomberg to the licensed physician differed wildly from the duties Arelo actually performed.

37.    Bloomberg, in fact, ordered Arelo to return to his duties as a translator/accountant, until his physician forcefully interceded on Arelo's behalf, noting Bloomberg's bad faith, serial

11

misrepresentations, as well as its numerous, ever-metamorphosing descriptions of Arelo's position.[3]

38.    On or about January 24, 2006, Arelo was issued a scathing performance review, which did not take into account that his workload had more than doubled and that support for his position had been eliminated. His EEC's were slashed another 50%, and, further, he was not given the standard raise available to similarly-situated, younger, non-disabled, white employees.

39.    On or about January 25, 2006, Arelo submitted another formal complaint of discrimination based on his age, his disability and his national origin.

40.    By pure coincidence, that same day, Arelo learned that one of his close family members had died the previous evening. On the afternoon of January 25, 2006, Arelo requested to take a few hours off from work in order to attend the wake and funeral. Boekamp, by e-mail dated January 25, 2006, initially refused to "accommodate" Arelo, but later gave him grudging permission to use half of an accrued "vacation day." Arelo graciously accepted this solution in light of the circumstances and was happy to use his vacation time to pay his respects. The request and Boekamp's permission were memorialized in writing.

41.    Disgracefully, less than 24 hours following the submission of Arelo's complaint of discrimination, Boekamp directed Arelo's team leader to call Arelo's wife on the day of the funeral, January 26, 2006. The team leader informed Arelo's wife in her native language that,

---

[3]In an explosive and somewhat uncharacteristic response, Arelo's physician, blasted Bloomberg's childish and transparent games stating that "[b]y classifying the position as Mr. Arelo's "current job" in your January 31, 2006 correspondence, you misrepresented your intent to change or modify his position to include additional duties."

according to Boekamp, Arelo had not reported for work, that he had violated company procedures in taking time off and would lose his job; all despite Boekamp's explicit written permission and directive that Arelo take half of a vacation day for purposes of attending the funeral.[4]

42.     As perfectly orchestrated by Boekamp, Arelo's grief-stricken wife broke down and began crying and screaming at Arelo for not asking permission to take off work at this most crucial time.  Arelo attempted to reassure and console her, but to no avail.

43.     Immediately thereafter, Arelo returned to work, demanding to know why Boekamp had done such a terrible thing.  Boekamp smiled and mused that Arelo had not properly designated the day in the system as an "out."  Arelo reminded Boekamp that, in the past, it was Boekamp who insisted on himself entering the days on the system and had always insisted upon entering the "out" notation in the system in Arelo's absence.  Mr. Boekamp then instructed Arelo to wait until the performance review to "talk about this."

44.     On or about January 27, 2007, at the supposed "performance review" meeting, Arelo asked Boekamp to please leave his family members out of this, that it was enough that the company was harassing him at the office but that there was no need to involve his wife.  Further, Arelo asked that Boekamp leave him alone to do his job in peace.  Boekamp screamed " I will never leave you alone!"  Defendant Niziolek was present, but did nothing and, instead, proceeded to warn Arelo that he was in danger of termination.

_____

[4]Rather than to live up to his written directive, it was apparently more important for Boekamp to harass, intimidate and continue to abuse not only Arelo, but also his family members on what was a very difficult day by calling Arelo at home in his hour of grief and to report to his wife that Arelo had violated company policies and procedures and would lose his job.

13

45.    With the knowing approval of the company and its Human Resources department, Boekamp again escalated his campaign to force Arelo out of the company. Over the next eight (8) months, from February until September of 2006, Arelo received approximately 15- 20 e-mail messages per day, directing him to change translated phrases such as "impossible" to "not possible" and vice-versa. Many of the e-mails either invited or required Arelo to set forth time consuming, rather elementary grammatical principals, while asking him for an explanation as to why the supposed "error" occurred and when it would be corrected. In many cases, Arelo was actually faulted with a translation error for correcting a word or phrase as previously directed, over his objections, an indication that many of the supposed "corrections" were clearly mere fabrications to harass, annoy and abuse Arelo.[5]

46.    During this period, Arelo also had his daily priorities shifted and rearranged such that he was told to disregard priority projects and complete lower-priority projects "immediately," despite the fact that such work remained in the processing queue for up to one month. Invariably, Arelo was faulted weeks later for missing or extending deadlines on the important projects.

47.    In or around October of 2006, after returning from a lunch break, Arelo noticed that his computer workstation had been tampered with. When Arelo looked into the internet

---

[5] One egregious example involved an incorrect instruction to substitute the verb "estar" for the verb "ser," over Arelo's objections, but then, quixotically, admonishing him for the rather obvious grammatical error that he had insisted – in writing – not be made in the first instance. For those unfamiliar with the Spanish and Portuguese languages, "ser" and "estar," although both translated into English as the verb "to be," connote precise states of temporal existence, laden with ancient cultural valuations as to which human, animal and other physical states are temporary and which are permanent. To the native speaker of Spanish or Portuguese, a basic error in the use of these verbs betrays fundamental ignorance, inherent unreliability of the information and the source, things Bloomberg might one day take seriously if it wishes to actually attain the multi-media conglomerate status to which it now pretends.

history filter, he saw dozens of pornographic website titles, most, if not all, dealing with sexual themes involving young children. Arelo took pains to document and report this activity to Human Resources, as well as to make a record for the authorities.

48.    On or about November 28, 2006, Arelo was presented with a letter of reprimand for supposed deficient performance. With the stress of his job at an unbearable point, Arelo again collapsed and was rushed to a nearby hospital. Defendant Kelbaugh immediately jumped into his car and began trailing the ambulance. Kelbaugh falsely identified himself as "Bloomberg security," ignoring the instructions of the paramedics to maintain a safe distance.

49.    According to the EMT report issued by the Paramedics and dated November 28, 2006, the ambulance was in fact forced to turn off its emergency lights and proceed at a slower pace because it was being followed too closely by "Bloomberg security."

50.    According to the lead paramedic on duty, the individual who identified himself as "Bloomberg security" (Defendant Kelbaugh) was told repeatedly to maintain a safe distance, but refused to do so and, as a result, the ambulance had to slow its pace for fear that one of the tailing vehicles would be hit at an intersection. The witness further stated that the situation was "weird," "completely bizarre," and unlike anything she had ever seen.

51.    Upon his arrival at the hospital, "Bloomberg security" (again, Defendant Kelbaugh, masquerading as some sort of security detail), along with Benny Tramo of Human Resources snuck into the emergency room and proceeded down the hallway, where Arelo was on a stretcher, waiting to be treated. These individuals claimed to be "friends" of Arelo and actually intercepted a phone call to the hospital by Arelo's wife, telling her that he was "fine" and that there was "no problem."

52.     Arelo learned of this call and immediately informed the attending physician that the Bloomberg company detail was in no way, shape or form friendly to him, that they had caused his collapse, and asked that they be removed from the hospital.

53.     Bloomberg later represented to Arelo that he, in fact, refused to have his vital signs checked and, once his vital signs were recorded, they were normal. In fact, the EMT report shows Arelo's vital signs on the outer extremes of the life-threatening, Stage II level.

54.     Arelo, fearing for his health, took a period of short-term medical leave based on the physical and psychological trauma that was inflicted upon him by Bloomberg and its despicable cronies.

55.     Upon the expiration of his short-term disability leave on or about July 2, 2007, Arelo was ordered to report to work, but told that his position had been "eliminated." The next day, Benny Tramo told Arelo that his position was never eliminated but, rather, that he had been replaced.

56.     According to Arelo's insurance carrier, his medical benefits were terminated by Tramo on or about April 14, 2007 but were never reinstated when he was ordered to return to work on or about July 2, 2007.

57.     On July 15, 2007, Arelo did not receive his paycheck. At the time of this filing, Arelo has been removed from payroll, but not notified formally of his termination.

## AS AND FOR A FIRST CAUSE OF ACTION
(Discriminatory Disparate Treatment in Violation of the Americans with Disabilities Act as Against Defendant Bloomberg L.P.)

58.     The Plaintiff incorporates by reference paragraphs "1" through "57" of the complaint as if such paragraphs were fully restated herein.

16

59.    The ADA protects disabled Americans from being discriminated against with regard to the terms and conditions of their employment based on their status as disabled employees.

60.    Plaintiff suffers from Coronary Artery Disease and Arterial Sclerosis, a qualified "disability" under the ADA, and was employed by Bloomberg from January 2, 2001 until approximately July 15, 2007, when he was removed from payroll.

61.    The Defendant has been aware of Plaintiff's disability since the inception of his employment.

62.    Despite his excellent qualifications, experience and performance, defendants subjected the Plaintiff to discriminatory disparate treatment, including, without limitation, contrived negative performance reviews, disparate pay, disparate overbearing supervision, false letters of reprimand, demotion, cancellation of benefits, battery, terror, harassment and, ultimately, termination.

63.    Similarly-situated, non-disabled workers were not followed into the bathroom, spied upon while using the toilet, pushed, disparately paid, given false deadlines, assailed with contrived complaints concerning accuracy of their work, followed in unmarked cars to the hospital thus impeding medical treatment, demoted and terminated; nor did similarly-situated non-disabled employees have their breaks timed, performance reviews altered, their family members harassed at a funeral or their benefits cancelled.

64.    Plaintiff's disability was an improper factor in the decision to demote, harass, disparately pay, terrorize, and terminate him.

65.    By reason thereof, Defendant Bloomberg has violated the Americans with

17

Disabilities Act and has caused plaintiff to suffer damages, including loss of past and future earnings, damage to his business reputation, his marketability, employment benefits, as well as severe physical, emotional and psychiatric injuries.

WHEREFORE, Plaintiff respectfully demands judgment as against the Defendant in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) in compensatory damages; punitive damages, if available, in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,00.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
(Failure to Accommodate a Reasonable Request for Accommodation in Violation of the Americans with Disabilities Act as Against Defendant Bloomberg)

66.    The Plaintiff incorporates by reference paragraphs "1" through "65" of the complaint as if such paragraphs were fully restated herein.

67.    The ADA ensures that any reasonable requests for accommodation of a disability be honored and prohibits an employer from denying, interfering and otherwise obstructing such a request, including, without limitation, reprisals against a disabled employee for making such a request.

68.    Defendant interfered, obstructed and harassed Arelo when he took medically-required bathroom breaks as a result of internal bleeding that he suffered.

69.    Further, Arelo was assigned duties that were totally unrelated to his position, which duties were inconsistent with the physical limitations of his disability and affirmatively

18

exacerbated his disability by, inter alia, increasing his blood pressure, causing internal bleeding, rapid heartbeat, and which were, moreover, assigned with the calculated intention of eliciting Plaintiff's resignation and exacerbating his medical condition.

70.    The Plaintiff made a reasonable, medically sanctioned, request that his position as a translator not be expanded to include re-training, testing and the performance of computerized balance sheet functions.

71.    Rather than honor Plaintiff's request, Defendant sent out four (4) wildly different position questionnaires, designed to trick Arelo's physicians into approving him for a translation position, while, in fact, transferring him to the very position against which Arelo's physician had advised.

72.    In so doing, the Defendant denied his requests for accommodation, through its efforts to obstruct, obfuscate and block not only his bathroom breaks but also Arelo's physician's requests for reasonable accommodation of his heart-related disability.

73.    By reason thereof, Defendant Bloomberg has violated the Americans with Disabilities Act and has caused plaintiff to suffer damages, including loss of past and future earnings, damage to his business reputation, his marketability, employment benefits, as well as physical, psychiatric and emotional injuries.

WHEREFORE, Plaintiff respectfully demands judgment as against the Defendant in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) in compensatory damages; punitive damages, if available, in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,00.00); the costs and disbursements of this action, including

19

reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
(Retaliation in Violation of the Americans with Disabilities Act as Against All Defendants)

74.     The Plaintiff incorporates by reference paragraphs "1" through "73" of the complaint as if such paragraphs were fully restated herein.

75.     The ADA prohibits retaliation by an employer against an employee who invokes his or her rights under the ADA, through complaints of discrimination based on disability.

76.     On or about January 25, 2006, Arelo lodged a formal complaint with Human Resources, stating that he had been abused, harassed, disparately treated, disparately compensated based on, inter alia, his status as a disabled person.

77.     Less than 24 hours later, the sadistic and unrelenting Boekamp, fostered, nurtured and condoned by Bloomberg LP, revoked Arelo's permission to attend a family funeral, ordered another employee to call Arelo's wife during the funeral to tell her that Arelo would lose his job for not reporting to work and screamed at Arelo that he would "never leave [Arelo] alone." This obscene and clearly retaliatory intrusion was followed by manufactured and inaccurate criticisms of his work, e-mails calculated to elicit lengthy, time-consuming responses; all the while management insisted upon false deadlines and priorities on projects that were never acted upon. Further, Arelo was subjected to contrived negative performance evaluations, harassment and was followed to the hospital, where Bloomberg's bully boys attempted to interfere with his treatment, and, ultimately, cut his benefits and removed him from Bloomberg's payroll.

78.     By reason thereof, the defendants have violated the anti-retaliation provisions of

the Americans with Disabilities Act and have caused plaintiff to suffer damages, including, without limitation, loss of past and future earnings, damage to his business reputation, his marketability, employment benefits, and physical, psychiatric and emotional injuries.

**WHEREFORE**, Plaintiff respectfully demands judgment as against the Defendant in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) in compensatory damages; punitive damages, if available, in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,00.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Retaliatory Hostile Work Environment in Violation of the ADA as Against All Defendants)

79.    Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "78" with the same force and effect as if fully set forth herein.

80.    By virtue of the acts as set forth above, defendants created and retaliated against Plaintiff by intensifying a hostile work environment which included, without limitation, monitoring of Arelo while he used the restroom, disparate, overbearing supervision, contrived negative performance evaluations, false letters of reprimand, harassment, demotion intrusion upon his family life and, ultimately, termination.

81.    By reason thereof, the defendants have violated the anti-retaliation provisions of the Americans with Disabilities Act and have caused plaintiff to suffer damages, including, without limitation, loss of past and future earnings, damage to his business reputation, his

21

marketability, employment benefits, and physical, psychiatric and emotional injuries.

**WHEREFORE**, Plaintiff respectfully demands judgment as against the Defendant in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) in compensatory damages; punitive damages, if available, in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,00.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Age Discrimination In Violation of the ADEA as Against All Defendants)

82.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "81" with the same force and effect as if fully set forth herein at length.

83.    Plaintiff was over the age of Forty (40) when he suffered disparate pay, disparate, overbearing supervision, contrived negative performance evaluations, false letters of reprimand demotion, and harassment and termination.

84.    Plaintiff's age was an impermissible factor in the adverse employment decisions enumerated above.

85.    Similarly situated younger employees (i.e. those with equivalent job duties and similar performance reviews) did not experience comparable treatment to that of Plaintiff.

86.    The ADEA prohibits discrimination on the basis of age.

87.    As a direct result of Defendants flagrantly discriminatory disparate treatment, Plaintiff suffered injury and harm, including, without limitation, loss of past and future earnings,

22

damage to his business reputation, his marketability, employment benefits, and physical,

psychiatric and emotional injuries.

**WHEREFORE**, Plaintiff respectfully demands judgment as against the Defendant in an

amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty

Thousand Dollars ($2,850,000.00) in compensatory damages; punitive damages, if available, in

an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred

Thousand Dollars ($28,500,00.00); the costs and disbursements of this action, including

reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court

deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Retaliation and Retaliatory Hostile Work Environment in Violation of the ADEA as Against All
Defendants)

88.     Plaintiff repeats, realleges and reiterates each and every allegation set forth in

paragraphs "1" through "87" with the same force and effect as if fully set forth herein.

89.     By virtue of the acts as set forth above, defendants retaliated against Plaintiff both

through discrete acts as well as through the creation of a hostile work environment which

included, without limitation, monitoring of Arelo while he used the restroom, disparate,

overbearing supervision, contrived negative performance evaluations, false letters of reprimand,

harassment, demotion intrusion upon his family life and, ultimately, termination.

90.     By reason thereof, the defendants have violated the anti-retaliation provisions of

the ADEA and have caused plaintiff to suffer damages, including, without limitation, loss of past

and future earnings, damage to his business reputation, his marketability, employment benefits,

23

and physical, psychiatric and emotional injuries.

**WHEREFORE**, Plaintiff respectfully demands judgment as against the Defendant in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) in compensatory damages; punitive damages, if available, in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,00.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Age Discrimination In Violation of Title VII of the Civil Rights Act of 1964 As Against All Defendants)

91.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "90" with the same force and effect as if fully set forth herein at length.

92.    Plaintiff was over the age of Forty (40) when he suffered disparate compensation, harassment, disparate, overbearing supervision, contrived negative performance evaluations, false letters of reprimand, demotion intrusion upon his family life, cancellation of his health benefits and, ultimately, termination.

93.    Similarly-situated younger employees were not subjected to such illegal, inhumane and despicable treatment.

94.    Plaintiff's age was an impermissible factor in the decision to disparately compensate, harass, abuse, demote and terminate Plaintiff.

95.    By reason of the acts of discrimination detailed herein, Defendants have violated Title VII of the Civil Rights Act of 1964 and have caused Plaintiff to suffer damages, including

but not limited to, loss of past and future income, damage to his business reputation and marketability, and physical, psychiatric and emotional injuries.

96.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,000.00); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
(National Origin Discrimination In Violation of Title VII of the Civil Rights Act of 1964 As Against All Defendants)

97.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "96" with the same force and effect as if fully set forth herein at length.

98.    Plaintiff is, and was, at all times relevant hereto, a Latin American man, who suffered disparate compensation, harassment, disparate, overbearing supervision, contrived negative performance evaluations, false letters of reprimand, demotion intrusion upon his family life, cancellation of his health benefits and, ultimately, termination.

99.    Similarly-situated white employees were not subjected to such illegal, inhumane and despicable treatment.

100.    Plaintiff's national origin was an impermissible factor in the decision to

25

disparately compensate, harass, abuse, demote and terminate Plaintiff.

101.   By reason of the acts of discrimination detailed herein, Defendants have violated Title VII of the Civil Rights Act of 1964 and have caused Plaintiff to suffer damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and physical, psychiatric and emotional injuries.

102.   Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,000.00); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION
(Retaliation In Violation of Title VII of the Civil Rights Act of 1964 As Against All Defendants)

103.   Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "102" with the same force and effect as if fully set forth herein at length.

104.   Defendants engaged in acts of retaliation, including harassment, false poor performance reviews, demotion, manufactured letters of reprimand and, ultimately, termination, as a direct result of Plaintiff's opposition to, and complaints concerning, age, disability and national origin discrimination that defendants perpetrated against him.

105.    Title VII of the Civil Rights Act of 1964 prohibits acts of retaliation in response to an employee's filing or communication of a complaint or charge of improper discrimination as Plaintiff did herein, and have caused Plaintiff to suffer damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, physical, psychiatric and emotional injuries.

106.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,000.00); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A TENTH CAUSE OF ACTION
(Disability Discrimination In Violation of The New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 As Against All Defendants)

107.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "106" with the same force and effect as if fully set forth herein at length.

108.    Plaintiff suffered a disability within the meaning of N.J.S.A. 10:5-5q , in that his condition impaired a normal bodily function.

109.    Defendants engaged in a pattern of discrimination against Plaintiff because of his

27

disability, including, but not limited to, disparate compensation, the monitoring of Arelo while he used the restroom, disparate, overbearing supervision, contrived negative performance evaluations, false letters of reprimand, harassment, demotion intrusion upon his family life, cancellation of his health benefits and, ultimately, termination."

110.    Similarly-situated non-disabled employees were not subjected to such illegal, inhumane and despicable treatment.

111.    Plaintiff's disability was an impermissible factor in the decision to disparately compensate, harass, abuse, demote and terminate Plaintiff.

112.    By reason of the acts of discrimination detailed herein, Defendants have violated The New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 , and have caused Plaintiff to suffer damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and physical, psychiatric and emotional injuries.

113.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,000.00); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
(Failure to Accommodate a Reasonable Request for Accommodation in Violation of the New Jersey Law Against Discrimination as Against Defendant Bloomberg)

114.    The Plaintiff  incorporates by reference paragraphs "1" through "113" of the complaint as if such paragraphs were fully restated herein.

115.    The New Jersey Law Against Discrimination ensures that any reasonable requests for accommodation of a disability be honored, and prohibits an employer from denying, interfering and otherwise obstructing such a request, including, without limitation, reprisals against a disabled employee making such a request.

116.    Arelo was assigned totally unrelated duties in relation to his position, which duties were inconsistent with the physical limitations of his disability and affirmatively exacerbated his disability by, inter alia, increasing his blood pressure, causing internal bleeding, rapid heartbeat, and were assigned with the calculated intention of eliciting Plaintiff's resignation.

117.    Defendant interfered, obstructed and harassed Arelo when he took medically-required bathroom breaks as a result of internal bleeding that he suffered.

118.    Further, Arelo was assigned duties that were totally unrelated to his position, which duties were inconsistent with the physical limitations of his disability and affirmatively exacerbated his disability by, inter alia, increasing his blood pressure, causing internal bleeding, rapid heartbeat, and which were, moreover, assigned with the calculated intention of eliciting Plaintiff's resignation and exacerbating his medical condition.

119.    The Plaintiff made a reasonable, medically sanctioned, request that his position as a translator not be expanded to include re-training, testing and the performance of computerized balance sheet functions.

29

120.    Rather than honor Plaintiff's request, Defendant sent out four (4) wildly different position questionnaires, designed to trick Arelo's physicians into approving him for a translation position, while, in fact, transferring him to the very position against which Arelo's physician had advised.

121.    In so doing, the Defendant denied his requests for accommodation, through its efforts to obstruct, obfuscate and block not only his bathroom breaks but also Arelo's physician's requests for reasonable accommodation of his heart-related disability.

122.    By reason thereof, Defendant Bloomberg has violated the New Jersey Law Against Discrimination and has caused plaintiff to suffer damages, including loss of past and future earnings, damage to his business reputation, his marketability, employment benefits, and physical, psychiatric and emotional injuries.

WHEREFORE, Plaintiff respectfully demands judgment as against the Defendant Bloomberg in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,000.00); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A TWELFTH CAUSE OF ACTION
(Age Discrimination In Violation of The New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 As Against All Defendants)

123.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "122" with the same force and effect as if fully set forth herein at length,

30

124.    Plaintiff was over the age of Forty (40) when he suffered disparate compensation, harassment, disparate, overbearing supervision, contrived negative performance evaluations, false letters of reprimand, demotion intrusion upon his family life, cancellation of his health benefits and, ultimately, termination.

125.    Similarly-situated younger employees were not subjected to such illegal, inhumane and despicable treatment.

126.    Plaintiff's age was an impermissible factor in the decision to disparately compensate, harass, abuse, demote and terminate Plaintiff.

127.    By reason of the acts of discrimination detailed herein, Defendants have violated The New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 , and have caused Plaintiff to suffer damages, including but not limited to, loss of past and future income, damage to his business reputation and marketability, and physical, psychiatric and emotional injuries.

128.    Defendants' conduct was intentional, malicious, and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand Dollars ($28,500,000.00); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A THIRTEENTH CAUSE OF ACTION
(National Origin Discrimination In Violation of The New Jersey Law Against Discrimination,
N.J.S.A. 10:5-12  As Against All Defendants)

129.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in
paragraphs "1" through "128" with the same force and effect as if fully set forth herein at length.

130.    Plaintiff is, and was, at all times relevant hereto, a Latin American man, who
suffered disparate compensation, harassment, disparate, overbearing supervision, contrived
negative performance evaluations, false letters of reprimand, demotion intrusion upon his family
life, cancellation of his health benefits and, ultimately, termination.

131.    Similarly-situated white employees were not subjected to such illegal, inhumane
and despicable treatment.

132.    Plaintiff's national origin was an impermissible factor in the decision to
disparately compensate, harass, abuse, demote and terminate Plaintiff.

133.    By reason of the acts of discrimination detailed herein, Defendants have violated
The New Jersey Law Against Discrimination, N.J.S.A. 10:5-12 , and have caused Plaintiff to
suffer damages, including but not limited to, loss of past and future income, damage to his
business reputation and marketability, and physical, psychiatric and emotional injuries.

134.    Defendants' conduct was intentional, malicious, and contrary to public policy, and
warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendants in
an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty
Thousand Dollars ($2,850,000.00) compensatory damages; punitive damages in an amount to be
determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand

32

Dollars ($28,500,000.00); the costs and disbursements of this action, including reasonable

attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just

and proper.

AS AND FOR A FOURTEENTH CAUSE OF ACTION

(Retaliation In Violation of The New Jersey Law Against Discrimination, N.J.S.A. 10:5-12  As
Against All Defendants)

135.   Plaintiff repeats, reiterates and realleges each and every allegation set forth in

paragraphs "1" through "134" with the same force and effect as if fully set forth herein at length.

136.   Defendants engaged in acts of retaliation, including harassment, false poor

performance reviews, demotion, manufactured letters of reprimand and, ultimately, termination,

as a direct result of Plaintiff's opposition to, and complaints concerning, age, disability and

national origin discrimination that defendants perpetrated against him.

137.   The New Jersey Law Against Discrimination, N.J.S.A. 10:5-12  prohibits acts of

retaliation in response to an employee's filing or communication of a complaint or charge of

improper discrimination as Plaintiff did herein, and have caused Plaintiff to suffer damages,

including but not limited to, loss of past and future income, damage to his business reputation

and marketability, physical, psychiatric and emotional injuries.

138.   Defendants' conduct was intentional, malicious, and contrary to public policy, and

warrants an assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendants in an

amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty

Thousand Dollars ($2,850,000.00) compensatory damages; punitive damages in an amount to be

determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand

33

Dollars ($28,500,000.00); the costs and disbursements of this action, including reasonable attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
(False Imprisonment As Against Defendants Bloomberg and Boekamp)

139.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "138" with the same force and effect as if fully set forth herein at length.

140.    Defendant Boekamp, individually and as agent and employee of Bloomberg LP, knowingly, intentionally and maliciously cornered Plaintiff on a routine basis in the various toilet stalls, preventing Plaintiff from leaving.

141.    In so doing, as reflected by the dates in Boekamp's log book, of which Arelo has a single page, Defendants falsely imprisoned the Plaintiff.

142.    As a direct and proximate result of Defendants' false imprisonment, Plaintiff has suffered damages, including but not limited to, humiliation, physical, emotional and psychiatric injury.

143.    Defendants' conduct was intentional, malicious and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, Plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Five Hundred Fifty Thousand Dollars ($550,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Five Million Five Hundred Thousand Dollars ($5,500,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest;

34

and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
(Civil Battery As Against Defendants Bloomberg and Boekamp)

144.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "143" with the same force and effect as if fully set forth herein at length.

145.    Defendant Boekamp, acting both individually and in his capacity as agent and employee of Bloomberg LP intentionally and maliciously pushed and nudged Plaintiff, in an attempt to threaten, harm and offend him and without his permission.

146.    As a direct and proximate result of Defendants' battery Plaintiff has suffered damages, including but not limited to, humiliation, physical, emotional and psychiatric injury.

147.    Defendants' conduct was intentional, malicious and contrary to public policy, and warrants an assessment of punitive damages.

WHEREFORE, Plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Five Hundred Fifty Thousand Dollars ($550,000.00) in compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Five Million Five Hundred Thousand Dollars ($5,500,000.00); the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other and further relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
(Intentional Infliction of Severe Emotional Distress As Against All Defendants)

148.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "147" with the same force and effect as if fully set forth herein at length.

149.   Defendants intended to cause Severe Emotional Distress upon the person of Plaintiff.

150.   Defendants in fact inflicted such severe emotional distress by corruptly changing his performance reviews, slashing his compensation, terrorizing him while he bled in the bathroom stalls, timed his bathroom breaks, contacting his wife during a funeral to inform her that he would be fired for failing to report to work, (despite the fact that Defendants had granted explicit, written permission for Plaintiff's attendance at the funeral), demoting him, assigning totally unrelated duties in order to elicit his resignation, assailing him with daily contrived criticisms and false letters of reprimand, following him to the hospital with the purpose of interfering with his medical treatment, lying about his condition, cancelling his health insurance and, ultimately, terminating him.

151.   As a direct and proximate result, Plaintiff has suffered damage and injury, including, without limitation, loss of past and future income, damage to his business reputation and marketability, physical, psychiatric and emotional injuries.

152.   Defendants' conduct was and remains, despicable, maniacal, beyond ken, and, at the very least, outrageous.

153.   Moreover, intentional, malicious, and contrary to public policy, and warrants an immediate assessment of punitive damages.

WHEREFORE, plaintiff respectfully demands judgment as against Defendants in an amount to be determined at trial, but in no event less than Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000.00) compensatory damages; punitive damages in an amount to be determined at trial, but in no event less than Twenty Eight Million Five Hundred Thousand

Dollars ($28,500,000.00); the costs and disbursements of this action, including reasonable

attorneys' fees, all relevant interest, and any such other relief to Plaintiff as this Court deems just

and proper.

## JURY DEMAND

154.    Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a jury trial on each and every

issue in this action.

Dated: New York, New York
      August 1, 2007

Neal Brickman (NB 0874)
David M. Kearney (DK 1996)
*Attorneys for the Plaintiff Atilio Arelo*
The Law Offices of Neal Brickman, PC
317 Madison-21st Floor
New York, N.Y. 10017
(212) 986-6840

**Exhibit A**

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  Atilio G. Arelo
47 Longview Ave.
Lake Hiawatha, NJ 07034

From:  Newark Area Office
1 Newark Center
21st Floor
Newark, NJ 07102

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2006-03171 | Amparo Soto, Supervisory Investigator | (973) 645-6016 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X]  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[X]  The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Corrado Gigante,
Director

JUN 1 9 2007

*(Date Mailed)*

Enclosures(s)

cc:  James Niziolek
Human Resources
BLOOMBERG LP
100 Business Park Dr.
P.O. Box 888
Princeton, NJ 08542

David M. Kearney, Esq.
317 Madison Ave., 21st Floor
New York, NY 10017

Enclosure with EEOC
Form 161-B (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge within 90 days of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed within 90 days of the date this Notice was *mailed* to you (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred more than 2 years (3 years) before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 -- not 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, please make your review request within 6 months of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*