UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

ATILIO ARELO                                              :

                              Plaintiff,                  :          Case No: 07 CV 6906 (LAK)

          -against-                                       :

BLOOMBERG L.P. AND THOMAS BOEKAMP, HANK       :
KELBAUGH AND BENNY TRAMO, INDIVIDUALLY, AND
IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES OF             :
BLOOMBERG LP,
                              Defendants.                 :

-----------------------------------------------------------------------x


PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS CERTAIN CAUSES OF ACTION IN THE AMENDED COMPLAINT










THE LAW OFFICES OF NEAL BRICKMAN, PC

Neal Brickman (NB 0874)
David M. Kearney (DK 1996)
317 Madison Avenue, 21st Floor,
New York, New York 10017
*Attorneys for Plaintiff Atilio Arelo*

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii
Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT I.

*The Amended Complaint sufficiently pleads facts which, if taken as true, establish Plaintiff's right to relief beyond a purely speculative level* . . . . . . . . . . . . . . . . . . . . . . 7

    A.    The current Rule 12(b)(6) FRCP pleading standard . . . . . . . . . . . . . . . 7

    B.    Plaintiff alleges sufficient facts, as opposed to mere labels and conclusions, that raise his claims above a purely speculative level . . . . . . 9

POINT II.

*Coronary Heart Disease, Arterial Sclerosis and Severe Hypertension, either alone or collectively, qualify as a disability under the ADA. Alternatively, Arelo had a history of disability while Bloomberg's initial attempts to reasonably accommodate Arelo, and its subsequent attempts to thwart such accommodation, are facts which, for purposes of a Rule 12(b)(6) motion, adequately establish that Defendant regarded Arelo as disabled under the Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    Heart Disease is recognized "disability" under the ADA. . . . . . . . . . . . 11

        1.    Arelo's condition substantially impairs one or more major life activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B.    The Amended Complaint Alleges that Arelo had a history of impairment and that Bloomberg Regarded Arelo as disabled . . . . . . . . . . . . . . . . . . 15

POINT III.

*Defendants conflate the prima facie elements of a cause of action for disparate treatment with those of a cause of action for retaliation by imposing a fact-specific pleading requirement of retaliatory animus, which is satisfied by close temporal proximity causation. Further, Defendants misapprehend Bell Atlantic's application to a prima facie case of employment discrimination by imposing something akin to a Rule 9(b) requirement for establishing animus in underlying discrimination claims* . . . . . . . . . . . 16

    A.    The allegations of the Amended Complaint sufficiently state a *prima facie* case of disparate treatment under the statutes invoked therein . . . . . . . . 16

B.    The allegations of the Amended Complaint sufficiently state a *prima facie* case of retaliation under the statutes invoked by the Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.    Defendants do not address Plaintiff's hostile work environment claims in any meaningful way . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

POINT IV.

*The allegations supporting claims under the NJLAD are sufficient to withstand a Rule 12(b)(6) motion to dismiss* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

*Alonzo v. Chase Manhattan Bank, N.A.,*
25 F.Supp.2d 455, 460 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ascon Properties, Inc. v. Mobil Oil Co.,*
866 F.2d 1149, 1155 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bell Atlantic v. Twombly,*
127 S.Ct. 1955, 1965 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 8, 9

*Bernstein v. City of New York 2007,*
WL 1573910, 3 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Brennan v. Metro. Opera Ass'n,*
192 F.3d 310, 318 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Burton v. Metropolitan Transp. Authority,*
244 F.Supp.2d 252, 257 (SDNY 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bush v. O.P.E.I.U. Local 153,*
499 F.Supp.2d 571, 572 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Car Carriers v. Ford Motor Co.,*
745 F.2d 1101, 1106 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cellamare v. Millbank, Tweed, Hadley & McCloy LLP,*
2003 WL 22937683, *5 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Colwell v. Suffolk Cty. Police Dep't,*
158 F.3d 635, 641 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Deravin v. Kerik,*
335 F.3d 195, 202 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Douglas v. Victor Capital Group,*
21 F.Supp.2d 379, 391 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

*Dura Pharm., Inc. v. Broudo,*
544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) . . . . . . . . . . . . . . . . . . . . . 7

*Epstein v. Kalvin-Miller Intern., Inc.,*
21 F.Supp. 2d 400, 403-404 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Failla v. City of Passaic,*
146 F.3d 149, 158 (3rd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Feingold v. New York,*
366 F.3d 138, 152 (2nd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Finley v. Cowles Bus. Media,*
No. 93 Civ. 5051, 1994 WL 273336 at *2 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Graves v. Finch Pruyn & Co., Inc.,*
457 F.3d 181, 187 (2nd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harris v. Forklift Sys., Inc.,*
510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hurley v. Atlantic City Police Dep't,*
174 F.3d 95, 129 (3d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Iqbal v. Hasty,*
490 F.3d 143, 157-58 (2d Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kassner v. 2nd Avenue Delicatessen Inc.,*
496 F.3d 229, 240 -241 (2nd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Kessler v. Westchester County Dept. of Social Services,*
461 F.3d 199, 210 -211 (2nd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*McMenemy v. City of Rochester,*
241 F.3d 279, 285 (2d Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Meling v. St. Francis College,*
3 F.Supp.2d 267, 273 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*O'Brien v. DiGrazia,*
544 F.2d 543, 546, n. 3 (1st Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Scaria v. Rubin,*
117 F.3d 652, 654 (2d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Treglia v. Town of Manlius,*
313 F.3d 713, 719 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Weixel v. Board of Educ. of City of New York,*
287 F.3d 138, 146-147 (2d Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ATILIO ARELO                                       :

                Plaintiff,              :        Case No: 07 CV 6906 (LAK)

      -against-                              :

BLOOMBERG L.P. AND THOMAS BOEKAMP, HANK  :
KELBAUGH AND BENNY TRAMO, INDIVIDUALLY, AND
IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES OF       :
BLOOMBERG LP,
               Defendants.            :
-------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS CERTAIN CAUSES OF ACTION IN THE AMENDED COMPLAINT

COMES NOW the Plaintiff, Atilio Arelo, ("**Arelo**"), by and through his attorneys, The

Law Offices of Neal Brickman, and as and for his Memorandum of Law in Opposition to

Defendants' Motions to Dismiss Certain Causes of Action in the Amended Complaint,[1] brought

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, states and alleges as follows:

## PRELIMINARY STATEMENT

The unfortunate facts of this case require no hyperbole, "finessing" or old lawyers' parlor

tricks to pass muster under the Rule 12(b)(6) standard, especially as clarified by the *Bell Atlantic*

case or by any of the authorities construing that decision in this Circuit. The facts as alleged,

taken in the light most favorable to the Plaintiff, establish an almost hellish hostile work

environment, where bully supervisors are unleashed upon the old and weak and those who just

don't fit the mold.  It is about a company, Bloomberg LP, which fosters and condones

---

[1] It should be noted that Defendants do not challenge the Eleventh Cause of Action (for failure to accommodate under the NJLAD), the Fifteenth Cause of Action (for Civil Battery), nor the Sixteenth Cause of Action (for Intentional Infliction of Severe Emotional Distress).

harassment, arbitrary, indeed inexplicable, cuts in compensation, altered performance reviews,

demotions made to look like promotions and, in this case, even threats to family members,

violence and intimidation, all as a means of forcing out those workers who do not fit well into or,

unthinkably, complain about the inequities spawned by, Bloomberg's youthful white majority

culture. This technique, as discovery will eventually bear out, is what is known gleefully and

euphemistically within the organization as the "managing out" of a particular employee. But this

is where the fun stops.

Defendant Bloomberg's arguments as to the federal claims are, in fact, quite simple.

First, Bloomberg asserts that under the U.S. Supreme Court's decision in *Bell Atlantic v.*

*Twombly,* 127 S.Ct. 1955, 1965 (2007), Arelo, as a general matter, has not alleged sufficient facts

to raise his right to relief above the speculative level. (Memorandum of Law in Support of

Defendants' Motions to Dismiss Certain Causes of Action in the Amended Complaint "**Def**

**Brief**" at pp. 7-8). Defendant's second contention is that Amended Complaint does not plead

sufficient facts to establish that Arelo suffered from an actual or constructive disability, within

the meaning of the ADA, in that Plaintiff's health condition did not "substantially impact" a

major life activity and that Plaintiff was not regarded as disabled by Bloomberg. (**Def Brief** at pp.

8-12). Defendant's third contention is that Plaintiff does not allege any facts to suggest that any

Defendant was motivated by discriminatory or retaliatory intent. Finally, Defendants collectively

argue that individual liability under the NJLAD is inappropriate based on the allegations of the

Amended Complaint. (**Def Brief** at 15-17).

As an initial matter, although Defendants purport to move against all of Plaintiff's federal

statutory claims, they do not even address the merits of Plaintiff's hostile work environment

allegations, nor do they even discuss the first basis for Plaintiff's failure to accommodate claim under the ADA; namely, Plaintiff's need for an accommodation due to severe internal bleeding. Further, Plaintiff contends, as set forth below, that Defendants' arguments are largely premised upon a reading of *Bell Atlantic* which is inconsistent with the rationale and the holding of the Supreme Court's decision, as well as at odds with cases construing *Bell Atlantic* in this Circuit. Moreover, Defendants' contention that there are no factual allegations, sufficient to withstand a Rule 12(b)(6) motion, with regard to discriminatory and retaliatory intent, is simply erroneous. A plaintiff is permitted an inference of discrimination under circumstances where similar adverse actions are not visited upon similarly-situated coworkers outside of the protected class. Finally, retaliatory animus is satisfied by a "close temporal proximity" test, as opposed to allegations of specific intent.

## FACTUAL STATEMENT

Plaintiff Atilio Arelo, a former Bloomberg LP ("**Bloomberg**") employee, is a fifty-nine year-old Latin-American man suffering from severe heart disease. (Amended Complaint "**Cmplt**" at ¶ 5). Specifically, Arelo suffers from Coronary Artery Disease, Arterial Sclerosis and severe high blood pressure or hypertension. (Cmplt ¶¶ 5, 59). Arelo's condition and consequent treatments cause internal bleeding, requiring him to take frequent bathroom breaks. (Cmplt ¶ 23-24). His condition also affects his ability to move around, his diet, and his ability to function under stress. (Cmplt ¶ 59). Nevertheless, Arelo is pre-eminently qualified for the translation position for which he was hired on January 2, 2001, by virtue of his thirty years of experience in the field, as well as the fact that he actually was tested by Bloomberg and was told he was exceptionally qualified for the position and could start immediately. (Cmplt ¶ 15). Consistent with his qualifications and experience, Arelo was given uniformly positive

3

performance ratings for the 2001-2003 period. (Cmplt ¶ 16). During this period, Arelo took

health-related absences purposes of receiving treatment for his heart condition, but always made

up the hours. (Cmplt ¶ 17). In September of 2003, Arelo's Latin American supervisor was

replaced by Defendant Thomas Boekamp ("**Boekamp**"), an individual of Germanic descent who

had no knowledge of the languages Arelo translated. (Cmplt ¶ 18). Boekamp cut Arelo's Equity

Equivalency Certificate compensation by 50%, based on a false performance review that Arelo's

previous supervisor told him had been altered, at Boekamp's directive, against her wishes.

(Cmplt ¶ 19-21). Boekamp also began criticizing Arelo's medically-required bathroom breaks

(Cmplt ¶ 24), timing Arelo while he was in the restroom and peering at him through gaps in the

bathroom stalls with a timer. (Cmplt ¶ 25). Boekamp did not treat other similarly-situated

younger, non-disabled, non-Latin workers in the same fashion. (Cmplt ¶ 26). Arelo complained

to Bloomberg's Human Resources division ("**Human Resources**"), which explained this was an

acceptable practice. (Cmplt ¶ 27). Boekamp then began timing Arelo's lunch breaks, bumping

into him in a threatening manner and circling Arelo with a timer during his lunch breaks. (Cmplt

¶ 28).

On or about March 22, 2005, Arelo was called into Human Resources reprimanded about

his bathroom breaks and performance. (Cmplt ¶ 30). At that meeting, Boekamp screamed at

Arelo and told him he would lose his job. *Id.* Arelo's blood pressure skyrocketed into the outer

boundaries of the Stage II limit; he collapsed and was rushed to the hospital. *Id.* Arelo returned to

work on or about May 23, 2005, but Boekamp's treatment of Arelo only intensified. (Cmplt ¶

31). On or about September 1, 2005, Arelo lodged a written complaint about Boekamp's

continued practice of following him into the bathroom and peering at him while seated inside the

4

stalls. (Cmplt ¶ 32). Human Resources explained that it was permissible for Boekamp to time Arelo while in the bathroom and that Boekamp was entitled to know the identity of a subordinate using a particular toilet stall. *Id.*

Approximately one month later, Boekamp attempted to place Arelo in an accounting position, requiring him to complete computerized balance sheets for Bloomberg's operations, in addition to his duties as a translator, without additional compensation. (Cmplt ¶ 33-34). The job required a crash training course, with rigorous examinations and other testing in the field of accounting. *Id.* Arelo began to suffer severe fluctuations in blood pressure. (Cmplt ¶ 34). In or around November of 2005, Arelo asked to be excused from these additional duties based on his medical condition but was told he needed a physician's opinion. *Id.* Arelo obtained a medical opinion on or about November 21, 2005, recommending – in fact prohibiting – the additional balance sheet operations and Arelo was temporarily relieved of the accounting assignments. *Id.*

However, Bloomberg made every attempt at thwarting the accommodation. It sent no fewer than four different requests for a medical opinion, each with a different position and title, to Arelo's physician for approval. (Cmplt ¶ 35). Arelo's physician, at his wits end, forcefully interceded on Arelo's behalf, admonishing Bloomberg to stop its misrepresentations and shenanigans. (Cmplt ¶ 36).

On or about January 24, 2006, approximately two months after submitting his physician's request for an accommodation, Arelo's Equity Equivalency Certificate pay was again slashed, he was rated as an exceedingly poor performer and not awarded the standard, cost-of-living adjustment afforded younger, non-disabled non-Latin workers. (Cmplt ¶ 37). The next day, on January 25, 2006, Arelo submitted another formal complaint to Human Resources, explicitly

5

complaining of discrimination and retaliation based on his disability, his age and national origin. (Cmplt ¶ 38). Less than 24 hours after submission of Arelo's complaint to Human Resources, Defendants retaliated against Arelo by calling his wife on the day of an excused family funeral, informing her that Arelo had not shown up for work, and threatened to terminate him. (Cmplt ¶ 40). Arelo, however, had explicit permission to take a "vacation day" for the funeral. (Cmplt ¶ 39). When Arelo returned to work on January 27, 2007, Arelo was called into a "performance review" meeting where Boekamp screamed "I will never leave you alone!" while the Human Resources representative threatened Arelo's job. (Cmplt ¶ 41).

Beginning just days later, in February 2006, and continuing until September of 2006, Arelo received approximately 15-20 e-mail messages per day, demanding that he make grammatically incorrect "corrections" then faulting him later when the error would inevitably surface. (Cmplt ¶ 44). During this 8-month period, he was given false deadlines on low-priority projects, told not to work on high priority projects and then faulted for missing deadlines. *Id.* In October of 2006, Arelo returned from lunch to discover his workstation had been tampered with and that someone had visited dozens of child-porn websites on his work computer, which he knew was monitored by Bloomberg. Arelo immediately documented the problem for Human Resources, but nothing was done about it. (Cmplt ¶ 46).

On or about November 28, 2006, Arelo was presented with a letter of reprimand for deficient performance. Under intense pressure, Arelo collapsed and was rushed to the hospital. (Cmplt ¶ 47). Arelo was tailed by Defendant Hank Kelbaugh ("**Kelbaugh**"), Boekamp's supervisor, as well as Benny Tramo ("**Tramo**") of Human Resources. The paramedic report describes the incident and reports that the ambulance was forced to turn off its emergency lights

6

for fear of causing an accident to the tailing car. (Cmplt ¶ 48). The ambulance also had to slow

its pace, as Kelbaugh refused all warnings to maintain a safe distance. Arelo was forced onto

psychiatric disability and reported to work on or about July 2, 2007. Upon his arrival, Arelo was

told that his position had been eliminated. (Cmplt ¶ 54). When Arelo followed up with

additional questions, Tramo admitted Arelo had been replaced. *Id.* On or about April 14, 2007,

Bloomberg cancelled Arelo's medical benefits (Cmplt ¶ 55) and Arelo was taken off the payroll

on July 15, 2007. (Cmplt ¶ 56).

## ARGUMENT

### *Point I*
*The Amended Complaint sufficiently pleads facts which, if taken as true, establish Plaintiff's right to relief beyond a purely speculative level.*

A.    The current Rule 12(b)(6) FRCP pleading standard:

The pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure

governs actions sounding in employment discrimination and, under Rule 8, complaints must

include "a short and plain statement of the claim showing that the pleader is entitled to relief."

*Bush v. O.P.E.I.U. Local 153,* 499 F.Supp.2d 571, 572 (S.D.N.Y. 2007) (quoting Fed.R.Civ.P.

8(a)(2)). Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and

therefore is "not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo,*

544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In *Bell Atlantic*, the Supreme Court

explained that, in order to survive a motion to dismiss, a plaintiff must allege "enough facts to

state a claim to relief that is plausible on its face." The Second Circuit has explained that *Bell*

*Atlantic* imposes a plausibility requirement on pleadings under Rule 8, but does not, as a general

matter, change the Rule 8 pleading standard: "the Court is not requiring a universal standard of

heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges

a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Bush,* 499 F.Supp 2d at 572 (citing *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007)).

*Bell Atlantic* involved a putative consumer class action under § 1 of the Sherman Act against various regional telephone service providers, the so-called "Baby Bells" or "incumbent local exchange carriers" (ILECs). *Bell Atlantic,* 2007 WL 1461066 at p. **4. Because § 1 of the Sherman Act extends only as far as a "contract, combination ..., or conspiracy, in restraint of trade or commerce," it was incumbent upon the class to plead facts suggesting the existence of an agreement, as opposed to mere conclusions based on observations of anti-competitive effect. *Id.* at **6. As such, *Bell Atlantic's* rationale rests on the antitrust pleading conundrum of "parallel conduct," i.e., whether the factual allegations are sufficient to establish "agreement," the *sine quá non* of any contract or conspiracy, as opposed to mere independent, identical action that happens to result in an anti-competitive effect of some sort. *Id.* The *Bell Atlantic* consumers had alleged, in conclusory fashion, that, based on the alleged absence of "meaningful competition," that the Court should infer allegations of a conspiracy:

In the absence of any meaningful competition between the [ILECs] in one another's markets, and in light of the parallel course of conduct that each engaged in to prevent competition from CLECs within their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another.

*Id.* at **5 (quoting ¶ 51 of the *Twombly v. Bell Atlantic* Complaint).

What the *Bell Atlantic* Court has done is far from the gut renovation of the pleading standard that Defendants would have this Court imagine. *Bell Atlantic* abrogates *Conley* only to

8

the extent that *Conley's* "any set of facts language" might "be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings." *Id.* at **10. *A fortiori,* the Supreme Court went on to note that *Conley* has never been interpreted so broadly as a practical matter. *Id.*[2] In fact, *Bell Atlantic* has been cited in this District for the simple proposition that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." *Bernstein v. City of New York 2007,* WL 1573910, *3 (S.D.N.Y. May 24, 2007) (quoting *Bell Atlantic,* 2007 WL 1461066, at *8 (U.S. May 21, 2007)).

> B.    Plaintiff alleges sufficient facts, as opposed to mere labels and conclusions, that raise his claims above a purely speculative level.

As an initial matter, Defendant Bloomberg purports to move against Counts I-X of the Amended Complaint[3] (i.e. all of Arelo's federal statutory claims), but reserves the bulk of its *Bell Atlantic* arguments for Arelo's ADA claims and, significantly, does not address Plaintiff's hostile work environment claims under any theory, in any way whatsoever. As set forth below, the

---

[2]The *Bell Atlantic* Court noted that "a good many judges and commentators have balked at taking the literal terms of the *Conley* passage as a pleading standard. See, *e.g., Car Carriers v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir. 1984) ("*Conley* has never been interpreted literally") and, "[i]n practice, a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory" (internal quotation marks omitted; emphasis and omission in original); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1155 (9th Cir. 1989) (tension between *Conley's* "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which his claim rests); *O'Brien v. DiGrazia,* 544 F.2d 543, 546, n. 3 (1st Cir. 1976) ("[W]hen a plaintiff ... supplies facts to support his claim, we do not think that *Conley* imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional ... action into a substantial one"); *McGregor v. Industrial Excess Landfill, Inc.,* 856 F.2d 39, 42-43 (6th Cir. 1988) (quoting *O'Brien's* analysis); Hazard, From Whom No Secrets Are Hid, 76 Tex. L.Rev. 1665, 1685 (1998) (describing *Conley* as having "turned Rule 8 on its head"); Marcus, The Revival of Fact Pleading Under the Federal Rules of Civil Procedure, 86 Colum. L.Rev. 433, 463-465 (1986) (noting tension between *Conley* and subsequent understandings of Rule 8).

[3]Defendants collectively move to dismiss Counts XII-XIV, while Counts XI, XV and XVI are not implicated by these motions.

9

Amended Complaint alleges that Arelo is a worker (a) of Latin American origin; (b) over the age

of 59; (c) who suffers from three specific medical conditions: Coronary Artery Disease, Arterial

Sclerosis and severe Hypertension, as well as chronic internal bleeding as a result of his

condition and treatment. (Cmplt ¶ 5, 17, 24, 59, 82). It is only when these specific facts are

applied to the law that the Amended Complaint states the conclusion that Arelo is a member of

one or more protected classes, hence satisfying the first prong of a *prima facie* case of

discrimination. Additionally, the Amended Complaint alleges, as a matter of specific fact, as

opposed to mere speculative conclusion, that Arelo suffered the following adverse employment

actions: (a) cuts in his compensation (Cmplt ¶¶ 19, 37); (b) contrived reviews affecting

compensation (Cmplt ¶ 20-21, 37); (c) demotion (Cmplt ¶ 33); (d) cancellation of his medical

benefits (Cmplt ¶ 55); and (e) termination (Cmplt ¶ 56). Additionally, many of the acts alleged

qualify as retaliatory and/or tend to establish a hostile work environment such as well-pleaded

instances of severe harassment, including, without limitation, calls to Arelo's  family members

during an excused funeral for purposes of threatening Arelo with termination (Cmplt ¶ 40),

monitoring Arelo in the bathroom and timing his bathroom breaks (Cmplt ¶¶ 25, 31), attempting

to plant child pornography on Arelo's computer workstation during his lunch break (Cmplt ¶ 46),

as well as tailing Arelo's ambulance to the hospital, forcing the ambulance to turn off its

emergency lights and slow its pace in order to avoid an accident, as detailed in the paramedic's

report. (Cmplt ¶¶ 48-51). Many of these acts followed on the heels of one of three formal

complaints of disparate treatment lodged with Human Resources as well as his requests for

accommodation. (Cmplt ¶¶ 27-28; 32; 38). Finally, it is specifically alleged, again as a factual

matter, that younger, non-disabled, white (i.e. non-Latin)[4] workers were not followed into the

bathroom; did not have their reviews intentionally falsified; did not experience arbitrary cuts to

compensation; were not demoted or terminated after having their benefits cancelled (Cmplt ¶ 62).

These factual allegations permit the inference of discrimination afforded by the *McDonnell*

*Douglass* definition of a *prima facie* case, even in the more stringent summary judgment

context. Hence, such specific factual allegations belie defendants' assertions that the Amended

Complaint states purely speculative conclusions that do not raise a right to relief.

*Point II*
*Coronary Heart Disease, Arterial Sclerosis and Severe Hypertension, either alone or*
*collectively, qualify as a disability under the ADA. Alternatively, Arelo had a history of*
*disability while Bloomberg's initial attempts to reasonably accommodate Arelo, and its*
*subsequent attempts to thwart such accommodation, are facts which, for purposes of a Rule*
*12(b)(6) motion, adequately establish that Defendant regarded Arelo as disabled under the Act.*

A.    Heart Disease is recognized "disability" under the ADA.

The ADA defines "disability" as, among other things, "a physical or mental impairment

that substantially limits one or more of the major life activities of such individual". 42 U.S.C. §

12102(2). In this Circuit, even generalized allegations of heart disease, without resort to the

specific, multiple diagnoses that Plaintiff has included in his Amended Complaint has been held

a qualifying disability under the Act. *Epstein v. Kalvin-Miller Intern., Inc.*, 21 F.Supp. 2d 400,

403-404 (S.D.N.Y. 1998). ("Plaintiff's heart disease clearly qualifies as a "disability" under this

definition.). Significantly in this case, even assuming proper medical treatment, Plaintiff is

substantially limited in one or more major life functions due to his internal bleeding that results

---

[4]Due to some uncertainty in the case law as to whether one's status as an "Hispanic" or "Latin" is better characterized as a race or a national origin," *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F.Supp.2d 455, 460 (S.D.N.Y. 1998) (cited by *Deravin v. Kerik*, 335 F.3d 195, 202 (2d Cir.2003)), Plaintiff broadly invokes the provisions of Title VII and pleads race/national origin discrimination in the alternative.

from such treatment. (Cmplt ¶ 24). Moreover, Plaintiff's heart disease qualifies as a disability in that it limits plaintiff's ability to engage in the major life activity of moving around and to undertake other forms of strenuous activity. *Epstein,* 21 F.Supp 2d at 404.  Finally, federal regulations interpreting the Act confirm that heart disease is properly classified as a "disability." *See Finley v. Cowles Bus. Media,* No. 93 Civ. 5051, 1994 WL 273336, at 2-3 (S.D.N.Y. 1994). Indeed, a sampling of cases treating such disease in this Circuit confirms that Arelo's condition, in fact a combination of conditions, qualifies as qualifying "heart disease" under precedent, under the regulations and as a matter of common sense.

### 1.  Arelo's condition substantially impairs one or more major life activities.

The regulations at 29 CFR § 1630.2 provide:

h) Physical or mental impairment means:

(1) Any physiological disorder, or condition ... affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), **cardiovascular,** reproductive, **digestive**, genito-urinary, hemic and lymphatic, skin, and endocrine ...

Additionally, "major life activity" is defined I the regulations as follows:

(i) Major Life Activities means functions such as **caring for oneself**, performing manual tasks, **walking**, seeing, hearing, speaking, breathing, **learning**, and **working**.

Further, the regulations also define "substantially limits" as:

(i) Unable to perform a major life activity that the average person in the general population can perform; **or**

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (*emphasis added*).

While the regulations are non-binding, Courts in this Circuit regularly invoke them on both sides of the line as reason to uphold or deny disability discrimination claims. *E.g. Colwell v. Suffolk Cty. Police Dep't,* 158 F.3d 635, 641 (2d Cir. 1998). The regulations suggest considering the following factors in determining whether a plaintiff's impairment substantially limits a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2). As acknowledged by the Second Circuit in *Colwell,* the "regulations also give guidance for determining whether an individual is substantially limited in the major life activity of 'working,'" providing that the ability to work is substantially limited if the plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Colwell,* 158 F.3d at 643; 29 C.F.R. § 1630.2(j)(3)(i). In this case, Arelo alleges several recognized major life functions which are substantially impaired by his condition.

*"Impaired Movement"*

The Amended Complaint alleges that Arelo suffers from impaired movement and that he is unable to move around comfortably. (Cmplt ¶ 59). Walking is a major life activity. *Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 391 (S.D.N.Y. 1998) ("walking is a per se major life activity"); *Meling v. St. Francis College,* 3 F.Supp.2d 267, 273 (E.D.N.Y. 1998). The allegation that Arelo is unable to move around comfortably, taken in the light most favorable to the Plaintiff, is clearly sufficient for purposes of a Rule 12(b)(6) motion to dismiss. *A fortiori,* even claims of an apparent short-term foot condition requiring surgery have been upheld under this

prong of the analysis. *Cellamare v. Millbank, Tweed, Hadley & McCloy LLP,* 2003 WL 22937683, *5 (E.D.N.Y. 2003). The *Cellamare* Court held that the Plaintiff, a "secretary with an excellent service record who was otherwise qualified to continue working at [defendant employer], and that two weeks after notifying [defendant] that she needed an operation she was terminated because of her disability" adequately stated a disability discrimination claim. *Id.* at *5. *See also Weixel v. Board of Educ. of City of New York,* 287 F.3d 138, 146-147 (2d Cir.2002) ("[A] plaintiff's complaint is sufficient to withstand [a motion to dismiss] if it alleges that (1) [the plaintiff] has a disability for purposes of ... [the Americans With Disabilities Act ("ADA") ], (2) she is otherwise qualified for the benefit that has been denied, and (3) she has been denied the benefit by reason of her disability"). Because the Amended Complaint, when read in the light most favorable to the Plaintiff, established that Plaintiff is "significantly restricted as to the condition, manner or duration under which he can move, as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity," he qualifies as an individual with a disability under the Act.

*"Dietary Restrictions"*

Although the Amended Complaint places Arelo physically in the Cafeteria where he was required to eat lunch (Cmplt ¶ 28), nowhere does it state that Arelo actually ate the cafeteria food, despite Defendant's disingenuous suggestions to the contrary. In fact, Arelo's diet is restricted by his condition, as alleged in the Amended Complaint. (Cmplt ¶ 59). Such digestive difficulties are recognized under the Act and its interpreting regulations. 29 CFR § 1630.2(h)(1). Therefore, based on this allegation alone, Plaintiff qualifies as "disabled" under the Act.

*"Internal Bleeding"*

14

Care for oneself is a regulatory "major life activity" and is implicated by Arelo's need to make frequent bathroom trips. To the extent that this is a chronic condition that will be with him for the rest of his life, he is significantly restricted as to the condition, manner or duration under which an individual care for himself as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity and hence qualifies as "disabled" under the Act.

B.    The Amended Complaint Alleges that Arelo had a history of impairment and that Bloomberg Regarded Arelo as disabled.

The Amended complaint makes clear that Arelo took absences for purposes of treating his heart condition and that his employer was on notice of those absences. (Cmplt ¶ 17). Even where an individual is not actually disabled, the employer's perception of the employee's disability controls. "Under 42 U.S.C. § 12102(2)(C) ('regarded as disabled'), the decisive issue is the employer's perception of his or her employee's alleged impairment." *Burton v. Metropolitan Transp. Authority,* 244 F.Supp.2d 252, 257 (SDNY 2003). To be "regarded as" disabled by an employer means that the employee:

(k) Has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(l) Is regarded as having such an impairment means:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraph (h) (1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

15

29 C.F.R. § 1630.2.  Hence, in this case, the fact that Bloomberg extended Arelo a reasonable

accommodation for his disability (Cmplt 34), despite later attempting to thwart that

accommodation, establishes, for purposes of this motion, that the employer regarded Arelo as

having a recognized disability at some point in time.

*Point III*

*Defendants conflate the prima facie elements of a cause of action for disparate treatment with those of a cause of action for retaliation by imposing a fact-specific pleading requirement of retaliatory animus, which is satisfied by close temporal proximity causation.  Further, Defendants misapprehend Bell Atlantic's application to a prima facie case of employment discrimination by imposing something akin to a Rule 9(b) requirement for establishing animus in underlying discrimination claims.*

    A.    The allegations of the Amended Complaint sufficiently state a *prima facie* case of disparate treatment under the statutes invoked therein.

The *prima facie* elements of a disparate treatment case under Title VII, the ADEA and the

ADA are functionally identical.  Plaintiff must allege: (1) that he belonged to a protected class;

(2) that he was qualified for the position he held; (3) that he suffered an adverse employment

action; and (4) that the adverse employment action occurred under circumstances giving rise to

an inference of discriminatory intent. *Feingold v. New York,* 366 F.3d 138, 152 (2nd Cir. 2004);

*Graves v. Finch Pruyn & Co., Inc.,* 457 F.3d 181, 187 (2nd Cir. 2006).  Here, Defendant

Bloomberg contends that plaintiff has not established a *prima facie* case because he has failed to

plead facts beyond a purely speculative level, raising an inference that his discharge was due to

age or disability or national discrimination.

However, even in a summary judgment context, "[t]he burden of establishing a *prima*

*facie* case [of discrimination] is not onerous, and has been frequently described as minimal."

*Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997) (per curiam) (citations omitted); *see also*

16

*Greenway,* 143 F.3d at 52 ("to make out a *prima facie* case is not a demanding burden"). In the instant case, plaintiff has met that *de minimis* requirement. For purposes of a Rule 12(b)(6) motion, then, it suffices that Plaintiff's complaint alleges facts establishing the elements of his claim, as opposed to the specific identities of the comparators or empirical data establishing discriminatory animus, information which can only be obtained in discovery.

In this case, Arelo has (1) established himself as a member of multiple protected classes, by alleging, as a factual matter, that he is 59 years old; that he is Latin American; and that he suffers from one or more recognized ADA disabilities. *See* Point II, *supra.* (Cmplt ¶ 5). Additionally, Arelo has alleged (2) that he was qualified for the position by virtue of his 30+ years of experience, Bloomberg's own testing scores, as well as the uniformly positive reviews Arelo received during his first two years of employment. (Cmplt ¶¶ 15-16). Further, the Amended Complaint alleges (3) that Arelo suffered adverse employment actions in that he experienced cuts in his compensation and contrived reviews affecting compensation (Cmplt ¶ 20-21); demotion (Cmplt ¶ 33); cancellation of his medical benefits (Cmplt ¶ 55); and, ultimately, termination of his employment. (Cmplt ¶ 56). Finally, Arelo alleges that younger, non-disabled, non-Latin workers did not have their reviews intentionally falsified; did not experience arbitrary cuts to compensation; were not demoted or terminated after having their benefits cancelled (Cmplt ¶ 62 ). These factual allegations are sufficient to permit the inference of discrimination, beyond a purely speculative level for purposes of a Rule 12(b)(6) motion to dismiss.

> B.    The allegations of the Amended Complaint sufficiently state a *prima facie* case of retaliation under the statutes invoked by the Amended Complaint.

In contrast to the elements required in a disparate treatment case, the gravamen of a

17

retaliation claim is unlawful retribution or retaliation for an employee's engaging in protected activity, requiring that (1) the Plaintiff engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against Plaintiff; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002). The intent element, contrary to Defendant's suggestion, is subsumed by the causal nexus prong of the analysis. *Id.* at 721.

In order to establish causation, Plaintiff must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent. A close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation. *Id.* "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra,* 252 F.3d at 217 (internal quotation marks omitted); *see also* Gordon, 232 F.3d at 117. Actions coming on the heels of protected activity satisfy the causation requirement and require no specific factual allegations of underlying discriminatory intent. *Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199, 210 -211 (2nd Cir. 2006).[5]

In this case, the Amended Complaint states that Arelo lodged at least three formal complaints to Human Resources, each followed by acts in retaliation almost immediately thereafter. The first complaint is constrained to Boekamp's following Arelo into the restroom and timing his bathroom breaks, activity reasonably believed by him to be protected under the

---

[5]Moreover, as to the "protected activity" element of a Title VII or ADEA retaliation claim, the plaintiff need only "have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII [or the ADEA]." *McMenemy v. City of Rochester,* 241 F.3d 279, 285 (2d Cir.2001). *Kessler,* 461 F.3d at 210-211.

ADA, in light of his condition. The complaint and Boekamp's response are described at
paragraphs 27-28 of the Amended Complaint, where Human Resources, after conducting an
"investigation," determined that Boekamp was without fault. In that particular instance,
Boekamp responded by stepping up the harassment, by bumping into Arelo in a threatening
manner, while circling Arelo at lunch time with a hand timer. (Cmplt ¶¶ 27-28). The second
instance occurred on or about September 1, 2005, when Arelo lodged a more second, written,
complaint about Boekamp's conduct. Within **one month** of that complaint, Boekamp attempted
to force Arelo out by assigning him to an accountant/translator position for which he was neither
prepared or qualified.(Cmplt ¶ 33). Arelo asked for the reasonable accommodation of being
excused from these duties and submitted a physician's opinion on or about November 21, 2005.
(Cmplt ¶ 34). Approximately **two months** later, on or about January 24, 2006, he had his
compensation slashed and was issued a contrived negative – in fact scathing – performance
review. (Cmplt ¶ 37). When Arelo specifically complained of discrimination, things began to
deteriorate rapidly. In **less than 24 hours,** Boekamp directed Arelo's team leader to call Arelo's
family members during a family funeral, supposedly because Arelo did not show up for work
after obtaining explicit permission to take "a vacation day" for the funeral by Boekamp himself.
(Cmplt ¶ 40). **Two days later**, on January 27, 2006, Boekamp screamed at Arelo in a meeting
with Human Resources, maniacally asserting that he would never leave Arelo alone. (Cmplt ¶
43), while Human Resources stood by and did nothing except await its turn to threaten Arelo
with termination. *Id.* From February until September of 2006, Boekamp was true to his word, and
Arelo was harassed daily, berated for making corrections that he was asked to make by
Bloomberg management and even had his priorities shifted so that he would miss deadlines.

(Cmplt ¶ 44). In October of 2006, Bloomberg and its henchmen even attempted to create a false record of Arelo as a pedophile, which was promptly thwarted by establishing that his computer was tampered with during Arelo's lunch break. (Cmplt ¶ 46). **Well within a year of Arelo's third formal complaint of discrimination**, he was handed a false letter of reprimand dated November 28, 2006, and collapsed on the spot. (Cmplt ¶ 47). The ambulance was goon-tailed by Defendants Kelbaugh and Tramo who claimed to be part of some sort of security detail, interfering with the ambulance driver's ability to get Arelo to the hospital and refusing instructions that the tailing Bloomberg vehicle maintain a safe distance. (Cmplt ¶ 48). Immediately thereafter, Arelo went on medical leave. (Cmplt ¶ 54). When he returned on July 2, 2007, he was told **immediately** that his position had been eliminated, but then later that he had been replaced. (Cmplt ¶ 54). He was thereafter stripped of his benefits on or about April 14, 2007 and terminated on July 15, 2007. (Cmplt ¶ 56).

If these factual allegations are taken as true, as required on a Rule 12(b)(6) motion to dismiss, it cannot seriously be contended that Arelo's lodging of three formal complaints of discrimination, requesting a reasonable accommodation for his disability and taking authorized medical leave followed, in some cases in a matter of days, by malicious acts, harassment, stripping him of his benefits and, ultimately, termination of his employment are insufficient to survive a Rule 12(b)(6) motion under the applicable standard.

C.     <u>Defendants do not address Plaintiff's hostile work environment claims in any meaningful way.</u>

Although Defendants' motions purport to attack Counts IV and VI of the Amended Complaint, it does not appear as though Defendants discuss Plaintiff's hostile work environment claims in any regard. An actionable discrimination claim based on hostile work environment is

one for which "the workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment....' " *Kassner v. 2nd Avenue Delicatessen Inc.,* 496 F.3d 229, 240 -241 (2nd Cir. 2007) (quoting *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The determination of hostility depends on whether a reasonable person would find the work environment to be hostile and whether plaintiffs subjectively perceived it to be so. *Id.* To establish a hostile work environment, plaintiffs must "prove that the incidents were sufficiently continuous and concerted to be considered pervasive." *Id.* "A plaintiff must also demonstrate that he was subjected to the hostility because of her membership in a protected class." *Id.*

At the pleading stage of the case, however, plaintiffs need **not** plead a *prima facie* case of discrimination based on hostile work environment, so long as they provide in the complaint a short and plain statement of the claim that shows that plaintiffs are entitled to relief and that gives the defendant fair notice of plaintiffs' claim for hostile work environment and the grounds upon which that claim rests. *See Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. 992. As such, it is a question for the fact finder, not the Court on a motion to dismiss, as to whether the hostile environment was a result of Plaintiff's membership in a particulat protected class. *Kassner,* 496 F.3d at 241. It should also be noted that invoking the term "harassment" in a pleading may be construed as an implied claim for hostile work environment.

In this case, such harassment was sufficiently continuous and concerted to be considered pervasive. On a continuous basis, Boekamp criticized Arelo's medically-required bathroom breaks (Cmplt ¶ 24), timing Arelo while he was in the restroom and peering at him through gaps

21

in the bathroom stalls with a timer. (Cmplt ¶ 25). Human Resources knew about the conduct, but

explained this was an acceptable practice. (Cmplt ¶ 27).  Boekamp then began timing Arelo's

lunch breaks, bumping into him in a threatening manner and circling Arelo with a timer during

his lunch breaks. (Cmplt ¶ 28).  On or about March 22, 2005, Arelo was actually summoned to

Human Resources and reprimanded about his medically-required bathroom breaks (Cmplt ¶ 30).

At that meeting, Boekamp screamed at Arelo and told him he would lose his job. *Id.*  Arelo

collapsed and was rushed to the hospital. *Id.* Arelo returned to work on or about May 23, 2005,

but Boekamp's treatment of Arelo only intensified. (Cmplt ¶ 31). On or about September 1,

2005, Arelo lodged a second  formal complaint about Boekamp's continued practice of following

him into the bathroom and peering at him while seated inside the stalls. (Cmplt ¶ 32).  Human

Resources explained that it was permissible for Boekamp to time Arelo while in the bathroom

and that Boekamp was entitled to know the identity of a subordinate using a particular toilet stall.

*Id.*

On or about January 24, 2006, Arelo's Equity Equivalency Certificate pay was again

slashed, he was rated as an exceedingly poor performer. Defendants actually called Arelo's wife

on the day of an excused family funeral, informing her that Arelo had not shown up for work,

and threatened to terminate him, (Cmplt ¶ 40), despite the fact that Arelo had explicit permission

to take a "vacation day" for the funeral. (Cmplt ¶ 39).  When Arelo returned to work on January

27, 2007, Arelo was called into a "performance review" meeting where Boekamp screamed "I

will never leave you alone!" while the Human Resources representative threatened Arelo's job.

(Cmplt ¶ 41).

Beginning just days later, in February 2006, and continuing until September of 2006,

22

Arelo received approximately 15-20 e-mail messages per day, demanding that he make grammatically incorrect "corrections" then faulting him later when the error would inevitably surface. (Cmplt ¶ 44). During this 8-month period, he was given false deadlines on low-priority projects, told not to work on high priority projects and then faulted for missing deadlines. *Id.* In October of 2006, Arelo returned from lunch to discover his workstation had been tampered with and that someone had visited dozens of child-porn websites on his work computer, which he knew was monitored by Bloomberg. Arelo immediately documented the problem for Human Resources, but nothing was done about it. (Cmplt ¶ 46).

On or about November 28, 2006, Arelo collapsed and was rushed to the hospital. (Cmplt ¶ 47). Arelo was goon-tailed by Defendant Hank Kelbaugh ("**Kelbaugh**"), Boekamp's supervisor, as well as Benny Tramo ("**Tramo**") of Human Resources. The paramedic report describes the incident and reports that the ambulance was forced to turn off its emergency lights for fear of causing an accident to the tailing car. (Cmplt ¶ 48). The ambulance also had to slow its pace, as Kelbaugh refused all warnings to maintain a safe distance. Arelo was forced onto psychiatric disability and reported to work on or about July 2, 2007. Upon his arrival, Arelo was told that his position had been eliminated. (Cmplt ¶ 54).

The extensive factual allegations of the Amended Complaint sufficiently allege the existence of a hostile work environment under the applicable standard.

### Point IV
*The allegations supporting claims under the NJLAD are sufficient to withstand a Rule 12(b)(6) motion to dismiss.*

Defendants' characterization of New Jersey State Law is a fair one. *Failla v. City of Passaic,* 146 F.3d 149, 158 (1998) ("[W]e predict that the New Jersey Supreme Court would find

23

that an employee aids and abets a violation of the LAD when he [or she] knowingly gives

substantial assistance or encouragement to the unlawful conduct of [the] employer."); *see also*

*Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 129 (3d Cir.1999) (predicting that New Jersey

courts would impose aiding and abetting liability only on supervisory employees), cert. denied,

528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000).  Nevertheless, as a factual matter, it

cannot be disputed (as to Boekamp) that, under the allegations of the Amended Complaint, not

only did he personally engage in the discrimination and retaliation at issue, was both a

"supervisor" under the NJLAD and individually participated in the wrongful acts which caused

Plaintiff injury.

Additionally, with regard to Tramo it would appear as though Tramo individually lied to

Arelo about the elimination of his position, cancelled his benefits, followed him to the hospital as

a means of harassing Arelo, intercepted phone calls from Arelo's wife, misrepresenting his

condition and, facilitating Bloomberg and Boekamp's discriminatory campaign against the

Plaintiff.

Finally, Kelbaugh is alleged to be Boekamp's boss and the mere fact that he participated

in the tailing of the ambulance provides Plaintiff the inference needed to prove that he not only

was aware of, but, in fact, aided abetted, compelled or coerced some, if not all of the acts which

were vistied upon the Plaintiff in this case.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court enter an

Order denying defendants' motions to dismiss in their entirety, awarding to Plaintiff the costs and

disbursements incurred by him in opposing these meritless motions, including reasonable

attorneys' fees, and for such other and further relief as equity and justice require.

Dated: New York, New York
      November 30, 2007

THE LAW OFFICES OF NEAL BRICKMAN, PC

By: _____

    Neal Brickman (NB 0874)
    David M. Kearney (DK 1996)
    317 Madison Avenue, 21st Floor,
    New York, New York 10017
    *Attorneys for Plaintiff Atilio Arelo*
