LEXSEE

**BRENDA CURTIS and ALVIN WILLIAMSON, Plaintiffs, -against- CITIBANK N.A., CITICORP NORTH, AMERICA, INC., and CITICORP SECURITIES, INC., Defendants.**

**97 Civ. 1065 (DAB)(THK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1999 U.S. Dist. LEXIS 23047**

**December 13, 1999, Decided**

**PRIOR HISTORY:**    [*1]  Adopting Order of January 9, 2002, Reported at: 2002 U.S. Dist. LEXIS 256.

**DISPOSITION:**    Magistrate recommended that defendants be granted summary judgment, and action be dismissed with prejudice.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1]Under Fed. R. Civ. P. 56(c), a motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2]The moving party for summary judgment must show the absence of a genuine issue as to any material fact.

*Civil Procedure > Summary Judgment > Opposition >*

*General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN3]In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. The inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN4]On a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried. If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN5]See 42 U.S.C.S. § 2000e-2(a)(1).

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN6]Title VII of the Civil Rights Act of 1964, 42

1999 U.S. Dist. LEXIS 23047, *1
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

U.S.C.S. § 2000e et seq., reaches conduct that requires people to work in a discriminatorily hostile or abusive environment.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN7]To prevail on a claim of a hostile work environment, a plaintiff must show (1) that the workplace was permeated with discriminatory intimidation sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive work environment; and (2) that a specific basis exists for imputing the conduct creating the hostile work environment to the defendants. The environment must be both objectively and subjectively offensive--one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. In assessing a claim of a hostile work environment, courts should consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. To constitute a hostile work environment, incidents of harassment must be repeated and continuous.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Defenses & Exceptions > General Overview*
*Torts > Vicarious Liability > Employers > Activities & Conditions > General Overview*
[HN8]There is a presumption that an employer is vicariously liable for harassment committed by a plaintiff's supervisor, but the employer may assert an affirmative defense by proving that: (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. The affirmative defense, however, is inapplicable, when the supervisor's harassment culminates in a tangible employment action. A supervisor is someone with immediate or higher authority over an employee. In contrast, where the harassment is committed by a

co-worker or co-employee, an employer will be liable only where the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.

*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Defenses*
*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Employer Liability > Supervisors*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN9]An employer's promulgation of an anti-harassment policy with a complaint procedure is an important, if not dispositive, consideration in evaluating employer liability.

*Evidence > Procedural Considerations > Burdens of Proof > Initial Burden of Persuasion*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN10]The standards for adjudicating a Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., disparate treatment claim are well established. A plaintiff bears the initial burden of establishing a prima facie case by a preponderance of the evidence. Although the plaintiff's initial burden in establishing a prima facie case of discrimination is minimal, it is not entirely without substance. To satisfy his or her initial burden, a plaintiff alleging unlawful disparate treatment must demonstrate that: (1) he or she is a member of a protected class; (2) he or she was qualified for the position for which he or she was not hired or, as alternatively described by some courts, he or she satisfactorily performed the duties required by his or her position; (3) he or she suffered an adverse employment action; and (4) the adverse action occurred in circumstances giving rise to an inference of discrimination on the basis of his or her membership in that class.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices >*

1999 U.S. Dist. LEXIS 23047, *1
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

*Interference With Protected Activities*

[HN11]To establish a prima facie case of retaliation, a plaintiff must show: (1) that he was engaged in protected activity under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection between the adverse activity and the protected activity. In determining whether the plaintiff has met the de minimis initial burden of showing 'circumstances giving rise to an inference of discrimination, the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn. However, conclusory allegations of discrimination are insufficient to satisfy the requirements of Fed. R. Civ. P. 56(c).

*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
*Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens*

[HN12]Once a plaintiff has established a prima facie case, a presumption of discrimination arises, and the burden shifts to the defendant, who must then show that a legitimate, nondiscriminatory reason exists for the alleged adverse employment action. The defendant need not prove by a preponderance of the evidence that the reasons for its actions were not unlawful, since the burden of persuasion remains with the plaintiff throughout the case; the defendant must simply articulate the existence of a nondiscriminatory reason. This articulation must be clear and specific. If the defendant presents legitimate reasons for its actions, the plaintiff must then carry the ultimate burden of persuasion as to the fact of intentional discrimination, i.e., that race or another protected status was a determinative factor motivating the employer's conduct. However, while a plaintiff cannot carry his burden by showing pretext alone, disbelief in the employer's nondiscriminatory justification, together with the elements of the plaintiff's prima facie case or other proof offered by the plaintiff, may be sufficient to permit an inference of discriminatory motivation.

*Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > Adverse Employment Actions > Discipline*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof*

[HN13]To establish that the enforcement of the workplace policies gives rise to an inference of discrimination, the fourth element of a prima facie case of disparate treatment, a plaintiff must show that she was treated differently from similarly situated co-workers because of her race. To be similarly situated to the plaintiff, other employees must report to the same supervisor as the plaintiff, and be subject to the same standards governing performance, evaluation and discipline. For a claim of selective enforcement of workplace rules or policies to reach a jury, a plaintiff must come forward with evidence consisting of more than mere conclusory or unsubstantiated statements.

*Labor & Employment Law > Discrimination > Actionable Discrimination*

[HN14]An employer is entitled to make business decisions determining the criteria required for a position, absent discriminatory motive in selecting the criteria.

COUNSEL: For BRENDA CURTIS, ALVIN WILLIAMSON, plaintiffs: Stephen Theodore Mitchell, Law Offices of Stephen T Mitchell & Assoc., New York, NY.

For CITIBANK, N.A., defendant: Bettina B. Plevan, Proskauer Rose Goetz & Mendelsohn, New York, NY.

JUDGES: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE. HON. DEBORAH A. BATTS, UNITED STATES DISTRICT JUDGE.

OPINION BY: THEODORE H. KATZ

OPINION

REPORT AND RECOMMENDATION

THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.

TO: THE HON. DEBORAH A. BATTS, UNITED STATES DISTRICT JUDGE.

This action was referred to me, pursuant to your

1999 U.S. Dist. LEXIS 23047, *1
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

Order of Reference, for general pretrial supervision and the resolution of dispositive motions. Brenda Curtis and Alvin Williamson bring this action against their former employers, Citibank, N.A., Citicorp North America, Inc., and Citicorp Securities, Inc. (collectively referred to as "Citibank"), alleging discrimination on the basis of sex and race in the form of a hostile work environment, disparate treatment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, [*2] et. seq., New York State Executive Law § 296, and the New York City Administrative Code § 8-502. After a period of extensive pre-trial discovery, defendants have moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I respectfully recommend that defendants' motion be granted.

**Background**

Plaintiffs Brenda Curtis and Alvin Williamson worked in different departments and had no overlapping supervisors during their tenure at Citibank.

Brenda Curtis, who is African-American, was hired by Citicorp Securities, Inc. in November 1994 as an administrative assistant. (Transcript of Deposition of Brenda Curtis ("Curtis Dep.") at 103, excerpts attached as Ex. E to Affidavit of Stephen Mitchell, Esq. ("Mitchell Aff.") and as Ex. 1 to Affidavit of Bettina B. Plevan, Esq. and to Reply Affidavit of Bettina B. Plevan, Esq. ("Plevan Aff.").) In July 1996, pursuant to Curtis' request, she was transferred to the position of Administrative Assistant supporting Ravi Apte, head of Global Products Services at Citicorp, North America, Inc. (Curtis Dep. at 119.) In January 1997, Apte assumed the position of head of Global Technology [*3] Infrastructure ("GTI") at Citibank, N.A., and Curtis continued as his administrative assistant, reporting to Mary Scott, who was Apte's Chief of Staff and had primary responsibility for managing the administrative functions of Apte's department. (Curtis Dep. at 120-121; Declaration of Mary Scott in Support of Defendants' Motion for Summary Judgment ("Scott Decl."), at PP 2, 4.) Curtis was terminated from her position on March 3, 1998. (Transcript of Deposition of Ravi Apte ("Apte Dep.") at 122, excerpts attached as Ex. C to Mitchell Aff. and as Ex. 7 to Plevan Aff.; Curtis Dep. at 469.)

Plaintiff Alvin Williamson, who is African-American, joined Citibank in April 1993 as an Assistant Vice President and Technical Systems Analyst for the AS-400 computer platform. (Transcript of Deposition of Alvin Williamson ("Williamson Dep.") at 173, 467, excerpts attached as Ex. G to Mitchell Aff. and as Ex. 2 to Plevan Aff.) In August 1994, Rosemarie O'Connors joined Citicorp, N.A., and became Williamson's direct supervisor. (Declaration of Rosemarie O'Connors in Support of Defendants' Motion for Summary Judgment ("O'Connors Decl."), at PP 1-4.) Williamson voluntarily terminated his employment at [*4] Citibank in September 1998. (Affidavit of Adrienne Sogno in Support of Defendants' Motion for Summary Judgment ("Sogno Aff."), at P 11.) [1]

> 1 Plaintiffs originally filed this action as a class action on behalf of other similarly situated employees at Citibank. They never sought certification of a class, however, and the action has proceeded on behalf of the two individual plaintiffs.

On January 28, 1997, Richard DiMaio, a Citibank employee on layoff status because his job had been eliminated, used Citibank's electronic mail system to send an e-mail containing jokes that were racially, sexually, and ethnically offensive. This "ebonics e-mail" was sent to ten Citicorp, N.A. employees and one outside consultant. See Ebonics E-Mail, attached as Ex. I to Exhibits to Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Plaintiffs' Exhibits"). That same day, one of the recipients of the e-mail, Susan Ravkin, forwarded the "ebonics e-mail" to Noel Murphy, another employee at Citicorp, N.A. See id. [*5] On January 30, 1997, Noel Murphy forwarded the e-mail to ten other employees at Citicorp, N.A. See id. The e-mail was not sent to either Curtis or Williamson, nor was it sent to any of their direct supervisors. (Curtis Dep. at 20; Williamson Dep. at 240.)

On January 30, 1997, Ron Clate, a white Citibank officer who had received the e-mail, gave Curtis a copy of it, telling her "this is wrong. I'm very upset by it and you do what you have to do." (Curtis Dep. at 20.) The next day, Curtis reported the e-mail to her supervisors, to the Human Resources Department, and to the office of Citibank Chairman and CEO John Reed. (Curtis Dep. at 37-39, 43-47.) Curtis also showed Williamson a copy of the e-mail. (Curtis Dep. at 71; Williamson Dep. at 239-240.)

Citibank's Corporate Staff Relations and Human

Resources Departments undertook an investigation in response to the e-mail. (Affidavit of Carol Jensen in Support of Defendants' Motion for Summary Judgment ("Jensen Aff."), at P 2; Affidavit of Virginia Gibbs in Support of Defendants' Motion for Summary Judgment ("Gibbs Aff."), at P 1.) As part of the investigation, duplicates were made of all existing e-mail messages of each of the twenty-two [*6] employees who had either sent or received the "ebonics e-mail," and they were reviewed to determine whether those individuals had sent or received any other inappropriate messages. (Jensen Aff., at PP 3-4; Gibbs Aff., at P 3.) Human Resources officers then interviewed all of the recipients of the e-mail to determine whether they had seen the e-mail, what they had done with it, and whether they had reported it. (Gibbs Aff., at P 8.)

On February 18, 1997, as a result of the investigation, Richard DiMaio, the employee who had originally sent the e-mail, was notified that he was no longer eligible for rehire by Citibank and that his severance benefits had been discontinued; two other employees were terminated; and an employee who was found to have encouraged the sending of the e-mail was placed on formal warning for three months. (Jensen Aff., at P 5; Gibbs Aff., at PP 11, 15-16; Letter from Virginia Gibbs to Richard DiMaio, dated February 19, 1997, attached as Ex. 1 to Gibbs Aff.) In addition, on February 18, 1997, Susan Ravkin was suspended without pay for one month and placed on final written warning for six months, making her ineligible for transfer, promotion, salary increase or [*7] bonus during that period. (Gibbs Aff., at P 12; Final Warning Memorandum, dated February 18, 1997, attached as Ex. 2 to Gibbs Aff.) On February 18, 1997, Noel Murphy was also suspended without pay for one month and placed on final written warning for six months; in March 1997, Murphy's employment was terminated. (Gibbs Aff., at P 13; Final Warning Memorandum, dated February 18, 1997, attached as Ex. 3 to Gibbs Aff.) Additionally, Citibank installed a banner on its e-mail system which appears when a user logs on to the e-mail system, and reminds the user of Citibank's policies with respect to e-mail usage. (Jensen Aff., at P 7; Banner, attached as Ex. 1 to Jensen Aff.) The banner states:

> Citicorp e-mail systems are for business use only. Use for any other purpose is prohibited and can result in corrective action/termination.    This    includes

communications, 'jokes,' or stories which are harassing, demeaning or offensive to any individual or group.... This communication is to reinforce our policies of ensuring a respectful work environment. Citicorp will not tolerate use of citimail or any communications which create a hostile or offensive work environment based on race, gender, [*8] nationality, culture, religion, sexual orientation, age, disability or any other personal characteristic. Please be advised that failure to comply with these policies can lead to corrective action up to and including termination. (Banner.) [2]

---

[2]    Plaintiffs allege that defendants delayed in placing the banners on the e-mail system until February 19, 1997, the same day that the press reported the "ebonics e-mail." See Plaintiffs' Statement Pursuant to Local Civil Rule 56.1 ("Pl. Rule 56.1 Statement"), at P 39. Defendants contend that installation of the banner began on February 14, 1997. See Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Def. Rule 56.1 Statement"), at P 39.

---

On February 20, 1997, Citibank Chairman and CEO John Reed issued two memoranda -- one to all Citibank employees and one to all senior managers -- reiterating Citibank's policy of maintaining a work environment free from hostile, intimidating, or offensive behavior, and informing employees that an investigation into the [*9] offensive e-mails was being conducted and that disciplinary action had been taken against those found to have violated bank policies. (Jensen Aff., at PP 8-9; Memorandum from John Reed to all Employees, attached as Ex. 2 to Jensen Aff.; E-Mail to all Senior Managers from John Reed, dated February 20, 1997, attached as Ex. 3 to Jensen Aff.) On February 24, 1997, Human Resources sent a memorandum to all of the recipients of the "ebonics e-mail" which reiterated the importance of reporting such inappropriate communications and advised the e-mail recipients of the investigation and of the disciplinary actions taken. (Gibbs Aff., at P 14.) Finally, Citibank developed a training program designed to reinforce Citibank policies against any conduct that is offensive, harassing or demeaning, which was conducted

Case 1:07-cv-06906-LAK    Document 15-2    Filed 12/20/2007    Page 6 of 27

1999 U.S. Dist. LEXIS 23047, *9
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

in March 1997 for employees in the business units in which the senders and recipients of the e-mail worked and for the units in which Curtis and Williamson worked. (Declaration of Toni Booker in Support of Defendants' Motion for Summary Judgment ("Booker Decl."), at PP 4-5.) Additional training sessions were then held with other employees of Citibank. (Booker Decl., at P 4.)

The primary [*10] complaint of both Curtis and Williamson with respect to Citibank's handling of the "ebonics e-mail," and the precipitating factor in this lawsuit, is that no one from Citibank ever apologized to Curtis and that Citibank did not take prompt action in response to the e-mail, but rather waited to act until the filing of the present action and the accompanying reports in the press. (Curtis Dep. at 54; Williamson Dep. at 280.) This action was filed on February 14, 1997, two weeks after Curtis first became aware of the e-mail. Curtis alleges that although she had several conversations with Human Resources employees about the e-mail during the course of the investigation, because so many different people called her claiming to be in charge of the investigation, because Judy Barkin in CEO Reed's office told her the incident was going to be taken "fairly seriously," and because Barkin asked Curtis to keep the incident between them, Curtis believed that Citibank's response was not going to be genuine and that the incident was not going to be taken seriously. (Curtis Dep. at 50-51, 249.)

In addition to their common allegations that the e-mail gave rise to a hostile work environment, plaintiffs [*11] Curtis and Williamson each contend that they were subject to separate acts of racial discrimination and/or retaliation, some of which contributed to a hostile work environment, over the course of their employment at Citibank. [3] Their individual allegations will be detailed in the discussion below.

3   Plaintiffs originally claimed discrimination on the basis of disparate compensation as well. Plaintiffs argue in their Memorandum of Law that they cannot prosecute this claim because they have been denied the further deposition of Rosemarie O'Connors, and they raise the issue of taking additional depositions as part of their Rule 56(f) motion. See Plaintiffs' Memorandum of Law ("Pl. Mem."), at 31. In a Memorandum Opinion and Order, dated July 27, 1999, the Court (Batts, J.) denied this Rule 56(f) motion.

## Discussion

### I. Summary Judgment Standard

[HN1]Under Rule 56(c), Fed. R. Civ. P., a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material [*12] fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986); Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). [HN2]The moving party must show the absence of a genuine issue as to any material fact. Celotex, 477 U.S. at 323-25, 106 S. Ct. at 2553-54; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); LaFond v. General Physics Services Corp., 50 F.3d 165, 171 (2d Cir. 1995); Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).

[HN3]In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986); LaFond, 50 F.3d at 171; Cronin, 46 F.3d at 202; Gallo, 22 F.3d at 1223; [*13] Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 57 (2d Cir. 1987). "The inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); see also Cronin, 46 F.3d at 202; LaFond, 50 F.3d at 171.

[HN4]On a motion for summary judgment, a Court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" Donahue, 834 F.2d at 58 (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)); see also LaFond, 50 F.3d at 171; Cronin, 46 F.3d at 203; Gallo, 22 F.3d at 1224. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Cronin, 46 F.3d at 203.

### II. Hostile Work Environment [*14]

Case 1:07-cv-06906-LAK    Document 15-2    Filed 12/20/2007    Page 7 of 27

1999 U.S. Dist. LEXIS 23047, *14
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

[HN5]Under Title VII of the Civil Rights Act of 1964, "it shall be an unlawful employment practice for an employer...to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). [HN6]Title VII reaches conduct that "requires people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993).*

[HN7]To prevail on a claim of a hostile work environment, a plaintiff must show (1) that the workplace was permeated with discriminatory intimidation sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive work environment; and (2) that a specific basis exists for imputing the conduct creating the hostile work environment to the defendants. See *Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*(citing *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986)*); [*15] *Harris, 510 U.S. at 23, 114 S. Ct. at 370; Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767-768 (2d Cir. 1998); Perry v. Ethan Allan, Inc., 115 F.3d 143, 149 (2d Cir. 1997).* The environment must be both objectively and subjectively offensive -- one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. See *Faragher, 118 S. Ct. at 2283; Meritor Savings Bank, 477 U.S. at 67, 106 S. Ct. at 2405; Richardson v. New York State Department of Correctional Services, 180 F.3d 426, 436 (2d Cir. 1999).* In assessing a claim of a hostile work environment, courts should consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23, 114 S. Ct. at 370; see also Richardson, 180 F.3d at 436; Franklin v. Consolidated Edison Company of New York, Inc., 1999 U.S. Dist. LEXIS 15582*, No. 98 Civ. 2286 (WHP), 1999 WL 796170, at *7 (S.D.N.Y. Sept. 30, 1999).

[*16] A recurring point in Supreme Court opinions is that "'simple teasing,' ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher, 118 S. Ct. at 2283; see also Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986); Baer v. Sprint Long Distance, 60 F. Supp. 2d 209*, No. 98 Civ. 6991 (CM), 1999 WL 592577, at *4 (S.D.N.Y. Aug. 2, 1999); *Jowers v. Green Chimneys Children Services, 1999 U.S. Dist. LEXIS 8018*, No. 98 Civ. 4724 (SHS), 1999 WL 349942, at *3 (S.D.N.Y. May 28, 1999). To constitute a hostile work environment, incidents of harassment must be repeated and continuous. See *Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 62 (2d Cir. 1992).*

[HN8]There is a presumption that an employer is vicariously liable for harassment committed by a plaintiff's supervisor, but the employer may assert an affirmative defense by proving that: (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective [*17] opportunities provided by the employer. See *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998); Faragher, 118 S. Ct. at 2292-2293; Caridad v. Metro-North Commuter Railroad, 191 F.3d 283, 295 (2d Cir. 1999); Nash v. New York State Executive Department, 1999 U.S. Dist. LEXIS 16066*, No. 96 Civ. 8354 (LBS), 1999 WL 959366, at *11 (S.D.N.Y. Oct. 20, 1999). The affirmative defense, however, is inapplicable, "when the supervisor's harassment culminates in a tangible employment action." *Burlington Industries, 524 U.S. at 765, 118 S. Ct. at 2270; see also Lara v. The City of New York, 1999 U.S. Dist. LEXIS 9740*, No. 97 Civ. 7663 (DLC), 1999 WL 459803, at *6 (S.D.N.Y. June 29, 1999). A supervisor is someone with "immediate or higher authority over an employee." *Alonzo v. Chase Manhattan Bank, N.A., 70 F. Supp. 2d 395*, No. 98 Civ. 2749 (LAK), 1999 WL 979433, at *2 (S.D.N.Y. Oct. 26, 1999); see also *Copeland v. Rosen, 38 F. Supp.2d 298, 303* (S.D.N.Y. March 9, 1999). In contrast, where the harassment is committed by a co-worker or co-employee, an employer will be liable only where [*18] the plaintiff demonstrates that "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Donovan v. Big V Supermarkets, Inc., 1999 U.S. Dist. LEXIS 12516*, No. 98 Civ. 2842 (AGS), 1999 WL 615100, at *5 (S.D.N.Y. Aug. 12, 1999); see also *Karibian v. Columbia University, 14 F.3d 773, 780 (2d Cir. 1994).*

*A. Brenda Curtis*

Curtis contends that the racially and sexually offensive "ebonics e-mail," and Citibank's failure to take prompt corrective action until reports of the e-mail appeared in the press and plaintiffs filed the present action, created a hostile work environment for her. Curtis further alleges that the presence on her floor of Susan Ravkin, one of the transmitters of the e-mail, made her uncomfortable and made it difficult for her to focus on her work. (Curtis Dep. at 92-97, 298.) [4] Curtis states that in February 1997, Ravkin asked Curtis if she knew where Ravkin could purchase a beanbag. Curtis believes that Ravkin's question had racist implications because "according to this Citimail we're not supposed to have any taste or you know, be whores or illiterate and you know, so a beanbag is all we can pick [*19] out." (Curtis Dep. at 95.) Curtis also alleges that one of the recipients of the e-mail, Robert Ferazi, gave her hostile looks when she saw him. (Curtis Dep. at 299-300.) Curtis further contends that after the e-mail was sent and she reported it, other employees were no longer cooperative in providing her the information she needed to compile a newsletter. (Curtis Dep. at 202, 299, 567-570.) Curtis does not, however, allege that any sender or recipient of the e-mail made inappropriate or offensive comments to her, with the exception of Ravkin's beanbag comment.

> 4  Although plaintiff sought to transfer to another department months later when she felt mistreated by her supervisors Mary Scott and Ravi Apte, there is no evidence in the record that she requested a transfer in the several months following her awareness of the e-mail because she found it too stressful to work where she could see Ravkin.

In support of her hostile work environment claim, Curtis contends that several comments, which she identifies as either [*20] racist or sexist, were made to her at various points in her tenure at Citibank. Curtis states that Elliot Conway, one of the people she worked for as an administrative assistant at Citicorp Securities, between 1994 and 1996, once told her that he would be hunting Samoans when he visited Africa. (Curtis Dep. at 101-102.) He also told her, during a discussion about the O.J. Simpson trial, that he thought that Simpson was guilty. (Curtis Dep. at 104-105.) Curtis complained about Conway to her supervisors and to Human Resources, and Curtis alleges that they told her to deal with the problem herself. (Curtis Dep. at 358-365.) However, she was reassigned to work for someone else, and when she

requested a transfer to another department because Conway was still in her vicinity, Citibank granted her request. (Curtis Dep. at 103, 113-114, 359-364.)

At Citicorp Securities, an Asian-American employee, after overhearing another employee tell Curtis that she had difficulty understanding a delivery person from a Chinese restaurant, stated that she did not understand Jesse Jackson. (Curtis Dep. at 108.) A colleague's supervisor, Thomas Murphy, showed her his boxer shorts, in response to Curtis' comment [*21] that he had changed his clothing very quickly. (Curtis Dep. at 350-351.) Murphy also tried to kiss Curtis in order to wish her well for the holidays, but when she told him "no, no, just a simple Merry or Happy, you know, would suffice," he complied with her request and never approached her again. (Curtis Dep. at 352-353.)

Curtis further alleges that racist and sexist comments by her supervisors at GTI, at Citibank, N.A., created a hostile work environment. Curtis contends that her supervisor, Mary Scott, referred to the administrative assistants as "girls," and in July 1997 called Curtis a "paranoid little girl." (Curtis Dep. at 376-377.) Curtis told her Human Resources Officer Stephen Cronin that her supervisor Ravi Apte, during a discussion about her final warning, had said that Blacks were beneath him. (Deposition of Stephen Cronin ("Cronin Dep.") at 136-137, attached as Ex. B to Mitchell Aff.) Apte had also referred to young mailroom employees as "boys." (Curtis Dep. at 133.) Curtis further alleges that Apte told her of his encounter in the street with an African-American man who had asked him for money by claiming to be Curtis' brother, and that Apte then asked her what her brother [*22] did, a question which Curtis found to be derogatory. (Curtis Dep. at 127-132.) Finally, Curtis alleges that Apte once yelled at her with such vigor that his saliva hit her face, an incident she labels as physically menacing. (Curtis Dep. at 367-76.)

There is no dispute that Curtis subjectively perceived her work environment to be hostile. The question which the Court must therefore address is whether there is any evidence in the record which would permit a reasonable jury to conclude that Curtis' work environment was objectively hostile, i.e., "whether a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." Richardson, 180 F.3d at 436.

Case 1:07-cv-06906-LAK    Document 15-2    Filed 12/20/2007    Page 9 of 27

1999 U.S. Dist. LEXIS 23047, *22
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

*1. The E-Mail*

Curtis' primary focus for her hostile work environment claim is on the "ebonics e-mail." This e-mail was undisputably racist and sexist, as well as being sophomoric and insulting to other ethnic groups. This e-mail alone, however, is insufficient to give rise to a hostile work environment. Curtis was not subjected to the e-mail on a repeated basis, nor did it pervade her work environment so [*23] as to substantially alter Curtis' working conditions. Nor, as a single offensive incident, was it so objectively severe or extreme vis-a-vis Curtis as to give rise to a hostile work environment. The e-mail was not even sent to Curtis, nor was it the subject of wide discussion at Citibank before Curtis reported it. Moreover, Curtis did not work with any of the senders of the e-mail, and had only incidental contact with a few of the senders or recipients. In fact, Curtis only became aware of the e-mail when a white co-worker brought it to her attention because he was offended by it and thought she might take action. (Curtis Dep. at 20.) [5]

5    Although the Court recognizes that an individual need not be a direct recipient of a derogatory comment for it to contribute to a hostile work environment, *see Perry,* 115 F.3d at 151; *Brown v. Middaugh,* 41 F. Supp.2d 172, 187 (N.D.N.Y. 1999), plaintiff's limited exposure to the e-mail lends further support to the fact that the e-mail alone was insufficient to create an actionable hostile work environment. *Cf. Owens,* 1997 WL 403454, at *2, n.4 ("I note that the e-mail was not directed at the plaintiffs. While this does not make the incident irrelevant to the plaintiffs' claim...it does lend further support to the conclusion that this single incident, standing alone, cannot create a hostile work environment for these plaintiffs.").

[*24] This conclusion, that the e-mail did not give rise to a hostile work environment, has already been drawn by another judge in the Eastern District of New York, in a case brought by the plaintiffs in this action against the individual senders of the e-mail. [6] *See Curtis and Williamson v. DiMaio, Captain, Murphy, and Ravkin,* 46 F. Supp.2d 206, 213-214 (E.D.N.Y. 1999)(holding that, as a matter of law, the hostile work environment claim by plaintiffs Curtis and Williamson which was solely based on the "ebonics e-mail," was insufficient as a matter of law to constitute a hostile work

environment); *see also Baer,* 60 F. Supp. 2d 209, 1999 WL 592577, at * 4 (pornographic picture which plaintiff claimed was e-mailed directly to her is not sufficient to establish the pervasiveness of discrimination necessary to show a hostile work environment); *Owens v. Morgan Stanley & Co., Inc.,* 1997 U.S. Dist. LEXIS 10351, No. 96 Civ. 9747 (DLC), 1997 WL 403454, at *2 (S.D.N.Y. July 17, 1997) (single racist e-mail is insufficient to form the basis for a claim of a hostile work environment).

6    Plaintiffs filed a separate action about the "ebonics e-mail" in the Eastern District of New York naming other defendants. That action was dismissed on a motion for summary judgment on the grounds that the e-mail did not create a hostile work environment and that the claims were duplicative of the claims in the present litigation. *See Curtis and Williamson v. DiMaio, Captain, Murphy, and Ravkin,* 46 F. Supp.2d 206 (E.D.N.Y. 1999).

[*25] Finally, even if the e-mail alone could be viewed as subjecting Curtis to a hostile work environment, there is no basis for imputing liability for the e-mail to Citibank. It is undisputed that none of the senders of the e-mail were Curtis' supervisors. Accordingly, Citibank can only be liable for its employees' actions if it either provided no reasonable avenue for complaint by Curtis or knew of its employees' racially and sexually hostile comments but did nothing about them. *See Perry,* 115 F.3d at 149; *Karibian,* 14 F.3d at 780.

Curtis reported the e-mail to her supervisors, Human Resources, and Citibank Chairman and CEO Reed, on January 31, 1997. (Curtis Dep. at 37-39, 43-47.) Corporate Staff Relations immediately determined which Human Resources officers were responsible for the individual employees listed on the e-mail as senders or recipients, created duplicates of all existing e-mail messages of each of the twenty-two employees listed as having either sent or received the e-mail, and reviewed each of these files. (Jensen Aff., at PP 2-4; Gibbs Aff., at P 3.) On February 4, 1997, four days after Curtis first reported the e-mail, the entire e-mail [*26] folder of Richard DiMaio, the employee who originated the e-mail, was printed. (Jensen Aff., at P 3.) Two days later, Citibank blocked DiMaio's e-mail access. (Gibbs Aff., at P 4.) Human Resources then decided that Citibank officers would speak with each of the three e-mail

senders -- DiMaio, Ravkin, and Murphy -- at the same time, so that none of them would be able to warn the others about the purpose of the interview. Those discussions were held on February 10, 1997. (Gibbs Aff., at P 7.) Human Resources officers then conducted interviews with all of the recipients of the e-mail to determine whether they had seen or read the e-mail, whether they had reported it, whether they had given it to anyone else, and whether they had ever seen similar e-mails. (Gibbs Aff., at P 8.) On February 14, 1997, just two weeks after the e-mail was first reported, Citibank began installing new banners on the e-mail system which reminded users when they logged on to the system that any communication that was offensive, demeaning, or derogatory was strictly prohibited. (Jensen Aff., at P 7.) Those banners were fully installed on the entire e-mail system by February 20, 1997. (Jensen Aff., at P 7.) On [*27] February 18, 1997, DiMaio, who had been on layoff status, was notified that he would no longer be eligible for rehire by Citibank and that his severance benefits had been discontinued. (Gibbs Aff., at P 11.) On February 19, 1997, Ravkin and Murphy were each suspended without pay for one month and were each placed on final written warnings for six months, making them ineligible for transfer, promotion, salary increases or bonuses during that period. (Gibbs Aff., at PP 12-13.) On February 20, 1997, upon the completion of the investigation, Citibank Chairman and CEO Reed sent a memorandum to all Citibank employees and an e-mail to all managers reiterating Citibank's policies prohibiting racial or sexual harassment and informing employees of the investigation and disciplinary action taken. (Jensen Aff., at PP 8-9.) On February 24, 1997, Human Resources sent a memorandum to all of the recipients of the e-mail reiterating the importance of immediately reporting any such inappropriate communications in the future and advising of follow-up investigations. (Gibbs Aff., at P 14.)

Plaintiffs do not dispute that Citibank took the aforementioned action. Rather, Curtis argues that Citibank waited [*28] too long to take action -- waiting to discipline the employees and install the banner until after the press reported the e-mail and the present action was filed. *See* Pl. Mem., at 26. Plaintiffs argue that Citibank's "malfeasance [in failing to take prompt action] placed Ms. Curtis and Mr. Williamson in harms way." *See* Pl. Mem., at 26. This action was filed only two weeks after the e-mail was reported. There is nothing in plaintiffs' submissions or in the record which indicates

that plaintiffs were harmed during the three weeks it took to complete a complex investigation, and to implement disciplinary and remedial action, at a huge corporation. There is no evidence that Curtis was subjected to any harassing e-mails during this three-week period (or that she even heard of further e-mails being distributed), or that she in any other way experienced acts of racial or sexual hostility during the three-week pendency of Citibank's extensive investigation.

Given the undisputed fact that Citibank began its investigation soon after receiving notice of the e-mails, and that within a two to three-week period, it completed an extensive investigation, disciplined the employees who had [*29] sent the e-mail, communicated the results of the investigation to all employees and reiterated Citibank's anti-harassment policies both via a letter to all employees and the new banner on the e-mail system, no reasonable jury could conclude that liability should be imputed to Citibank for failing to take "prompt and appropriate corrective action" with respect to the e-mails. *Cf. Donovan, 1999 U.S. Dist. LEXIS 12516, 1999 WL 615100*, at *6 (finding prompt action where investigation began two days after the incident took place and one day after plaintiff first reported the incident) (citing *Johnson v. Wal-Mart Stores, Inc., 987 F. Supp. 1376, 1390 (M.D.Ala. 1997)*(granting defendant summary judgment where investigation occurred one month after plaintiff reported harassing behavior)); *Fleenor v. Hewitt Soap Co., 81 F.3d 48, 50 (6th Cir. 1996)*(holding that defendant took prompt and appropriate corrective action where defendant reprimanded harassing co-worker in September, because of an incident that had occurred during a two week period in August)); *compare Kracunas v. Iona College, 119 F.3d 80, 90 (2d Cir. 1997)*(finding a genuine issue of fact as to [*30] whether conduct should be imputed to the employer where employer took no action for four to six months after plaintiff complained to the employer).

As to the adequacy of Citibank's response to the e-mail, Curtis' objections center on Citibank's failure to apologize to her and the bank's failure to effect adequate remedial measures until after the filing of the present action. It is unclear why Curtis believed that Citibank should have apologized to her, since she was not the recipient or subject of the e-mail. Indeed, there is no evidence that she ever indicated to anyone involved in the investigation that she believed Citibank should apologize to her. In any event, Citibank's failure to apologize to

1999 U.S. Dist. LEXIS 23047, *30
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

Curtis does not undermine the fact that it conducted an extensive investigation and took appropriate action to both discipline the offenders and to reiterate to all employees its anti-discrimination policies. Moreover, Curtis did not wait to allow Citibank to conclude its broad investigation into the e-mail before filing the present action. Nor did Curtis allow Citibank reasonable time to coordinate its disciplining of the e-mail senders, its installation of new e-mail banners, and its [*31] issuance of a memorandum to all of the employees of Citibank. Rather, Curtis and Williamson initiated the present litigation a mere ten business days after Curtis first learned of the e-mail, although they were aware of the ongoing investigation by Citibank.

Drawing all inferences in favor of plaintiff, there is simply no basis on which a reasonable trier of fact could conclude that either the scope of Citibank's investigation, its failure to apologize to Curtis, or its failure to complete the investigation and take appropriate remedial and disciplinary action within the ten days it took plaintiffs to file this action, rendered Citibank's corrective action ineffective or inadequate. Accordingly, even if the e-mail alone were sufficient to give rise to a hostile work environment claim, no reasonable jury could conclude that Citibank should be held liable for the e-mail.

### 2. Other Allegations of Hostile Work Environment

The other conduct Curtis cites -- a limited number of isolated incidents and passing remarks made by different people, some of whom she does not even identify, and made over the course of four years -- is insufficient to constitute the steady stream of comments [*32] required to establish a hostile work environment. Cf. _Salvatore v. KLM Royal Dutch Airlines_, 1999 U.S. Dist. LEXIS 15551, No. 98 Civ. 2450 (LAP), 1999 WL 796172, at *10 (S.D.N.Y. Sep. 30, 1999) (dismissing hostile work environment claim where plaintiff did not allege that the conduct occurred with any significant frequency, and therefore it was insufficient to constitute a "steady barrage of opprobrious racial comments"). Indeed, most of the comments and incidents which Curtis identifies as racist or sexist, have no clear racist or sexist overtones, thereby failing to meet the objective prong necessary for a plaintiff to prove a hostile work environment claim. See _Scott v. Central School Supply, Inc._, 913 F. Supp. 522, 529 (E.D.Ky. 1996), aff'd. 121 F.3d 709 (6th Cir. 1997)("conduct which is 'sex [or race] neutral' is not to be considered in a hostile environment claim"); _Taylor, 1999_

_U.S. Dist. LEXIS 2583, 1999 WL 124456_, at *18 (race-neutral, ambiguous comments were insufficient to allow a rational factfinder to find discriminatory conduct); _Burrell v. Bentsen, 1993 U.S. Dist. LEXIS 18005_, No. 91 Civ. 2654 (KMW)(NRB), 1993 WL 535076, at *9 (S.D.N.Y. Dec. 21, 1993)(dismissing hostile [*33] work environment claim because there was no basis for construing the reprimand "three strikes and you're out" as racist and sexist, as the plaintiff claimed it was). Among the racist and sexist comments Curtis cites is Ravkin's question of whether Curtis knew where Ravkin could purchase a beanbag. Objectively, there is no racial connotation to this question; moreover, Curtis acknowledges that she did not experience the comment as racially hostile and only ascribed a racist undertone to the question after she learned that Ravkin had forwarded the "ebonics e-mail." (Curtis Dep. at 95.)("Given the type of person she is and her asking me about where to get a beanbag from, maybe she feels because I'm an African American woman I would know where to get a beanbag.")

Similarly, Curtis' reliance on the allegedly hostile looks Robert Ferazi gave her after he had received the "ebonics e-mail," rests on the unsupported speculation that Curtis believed that he was giving her hostile looks because Curtis knew that he had received the e-mail. Even drawing all inferences in plaintiff's favor, this conclusory assertion is insufficient to support a hostile work environment claim. Curtis also ascribes [*34] racial animus to Ravi Apte's question to Curtis of what her brother did for a living -- a question asked after a scam artist on the street claimed to be Curtis' brother and asked Apte for money. Apte's question, particularly given the context, objectively evidences no racial animus, and could not support a hostile work environment claim. Curtis also cites Elliot Conway's statement during a discussion with Curtis about the O.J. Simpson trial, that he believed Simpson was guilty. There is nothing objectively hostile or racist about this comment. Title VII was not intended to impose uniformity of beliefs or to require a Court or jury to probe the subconscious attitudes underlying a co-employees' opinions. See _Snell, 782 F.2d at 1104_. [7] Curtis' complaint that a co-worker attempted to kiss her in wishing her well for the holidays similarly fails to present evidence of a hostile work environment, since a Court must consider "the social context in which particular behavior occurs and is experienced by its target." _Oncale v. Sundowner Offshore Services, Inc._, 523 U.S. 75, 118 S. Ct. 998, 1003, 140 L.

1999 U.S. Dist. LEXIS 23047, *34
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

Ed. 2d 201 (1998)(ordinary socializing should not be mistaken [*35] for discriminatory conditions of employment).

7   There is no evidence that Citibank was unresponsive to plaintiff's complaints about Conway. Although plaintiff alleges that when she complained about Conway's behavior to her Human Resources officer, the officer told her to deal with it herself (Curtis Dep. at 363-364), Curtis acknowledged in her deposition that when she complained to her supervisor about Conway, Conway was reassigned to work with another administrative assistant. (Curtis Dep. at 103, 113.) Moreover, when Curtis told her boss that even though she was no longer working for Conway, he was still in the area and consequently she was requesting a transfer, Citibank granted her the transfer she requested. (Curtis Dep. at 365.) Thus, there is no basis for imputing liability to Citibank for any "hostile" comments by Conway.

Similarly, Curtis' claim that on one occasion Apte shouted at her so vigorously that his saliva hit her face, bears no direct connection to racial or sexual animus. Curtis concedes [*36] that Apte had accused her of taping a conversation with her supervisor, Mary Scott, and that he told her that taping a conversation was against Citibank's policies. Curtis had told him that if he was going to lie, she would not speak to him, and then she walked out of his office. Apte then told her to return to his office and to sit down. When she refused, he "got close to me and said -- and yelled at me and said, 'I said come in here and sit down.'" She stated that she was going to call the police because she felt physically threatened by this incident. (Curtis Dep. at 367-376.) Curtis does not allege that Apte physically threatened her in a sexually offensive way, or that their conversation had any racial or sexual subtext. Rather, she attempts to connect this incident to a racially and sexually discriminatory work environment because she alleges that she never saw Apte yelling at Caucasian employees, although she concedes that she cannot remember whether or not she had ever seen him being abrasive with a Caucasian person. (Curtis Dep. at 375-376.) The mere fact that Apte was standing close to her and yelling at her about her refusal to speak to him about an alleged violation of [*37] company policy, objectively neither contains nor suggests racial or sexual animus, and thus is not evidence that supports a hostile work environment

claim. Cf. *Bickerstaff v. Vassar College*, 196 F3d 435, No. 98-7702, 1999 WL 1038283, at *14 (2d Cir. Nov. 12, 1999)("Title VII is not a 'general civility code'"); *Cardozo v. Healthfirst, Inc.*, 1999 U.S. Dist. LEXIS 15364, No. 98 Civ. 3050 (RMB), 1999 WL 782546, at *8 n.15 (S.D.N.Y. Sept. 30, 1999)(quoting *Christoforou v. Ryder Truck Rental, Inc.*, 668 F. Supp. 294, 303 (S.D.N.Y. 1987)("the law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or unfortunately, even to behave reasonably and justly when he is peeved"); *Taylor v. Polygram Records*, 1999 U.S. Dist. LEXIS 2583, No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *16 (S.D.N.Y. March 8, 1999)(holding that plaintiff's belief that there was racial hostility in employer's statement, "I am your boss and you report to me," was based solely on her gut instinct, and was insufficient to create an inference of discrimination). 8

8   Several of the other comments Curtis cites as being racially hostile were either not directed to her or, on their face, were not objectively racial or racially hostile. For example, plaintiff claims that Apte referred to the young men in the mailroom as "boys." As an initial matter, there is nothing in the record which indicates the race of the employees in the mailroom. Further, Apte testified that he referred to the young men in the mailroom as "boys," because of their relative youth, and that as a native of India, he was not aware of any racist implication to that term. After Curtis told him that she found it offensive, he did not use the term again. (Apte Dep. at 133.) Similarly, Scott states that she referred to the administrative assistants as "girls," because in England where she was born and where she had worked prior to working at Citibank, "girls" is a term of familiarity. (Scott Decl., at P 10; Curtis Dep. at 134, 137.)

[*38] Similarly, Curtis' conclusory and generalized assertion that after she reported the e-mail, other employees were no longer as cooperative in assisting her in reporting the data necessary for her to compile a newsletter, does not give rise to an inference that the treatment was motivated by discriminatory animus. Cf. *Meckenberg v. New York City Off-Track Betting*, 42 F. Supp.2d 359, 373 (S.D.N.Y. 1999)(the "mere fact that Meckenberg [plaintiff] is white and female and that she did not always receive the respect and help she desired

does not create the inference that the treatment was motivated by a discriminatory animus").

The aforementioned passing comments, made by different individuals over a four year period, and having no clear or objective racial or sexual connotation, are insufficient as a matter of law to establish a hostile work environment. Cf. Adorno v. Lord & Taylor, 1999 U.S. Dist. LEXIS 14866, No. 97 Civ. 4444 (RCC), 1999 WL 759995, at *3 (S.D.N.Y. Sept. 27, 1999)(holding that four incidents over nine months was insufficient as a matter of law to create a hostile work environment); Gregg v. New York State Department of Taxation and Finance, 1999 U.S. Dist. LEXIS 5415, No. 97 Civ. 1408 (MBM), 1999 WL 225534, [*39] at *12 (S.D.N.Y. April 19, 1999)(holding that ten to fifteen relatively unobjectionable conversations, combined with four minor incidents of touching over the course of three to four months, is not sufficiently severe or pervasive so as to create an abusive working environment); Williams v. Port Authority, 880 F. Supp. 980, 991 (E.D.N.Y. 1995)(five racial epithets by supervisors in plaintiff's presence, over two-year period, held to be insufficient); Picotte v. Community Child Care, Inc., 901 F. Supp. 588, 594 (W.D.N.Y. 1995) (four objectively insensitive and confrontational comments held insufficient); Trotta v. Mobil Oil Corp., 788 F. Supp. 1336, 1347 (S.D.N.Y. 1992)(plaintiff alleging eleven incidents of sexual harassment in seven and a half years, failed to show hostile work environment where few of the incidents were directed at plaintiff and most were separated in time).

Because the evidence offered by plaintiff would not permit a reasonable finder of fact to conclude that Curtis' work environment was permeated with discriminatory conduct, comments or slurs, I respectfully recommend that summary judgment be granted with respect to [*40] Curtis' hostile work environment claims.

B. Alvin Williamson

Williamson worked for Citibank for five and a half years. As does Curtis, Williamson complains that the "ebonics e-mail" created a hostile work environment for him at Citibank. Williamson was only exposed to the e-mail when Curtis showed it to him, shortly after one of the recipients had shown it to her. (Curtis Dep. at 71; Williamson Dep. at 239-240.) The e-mail was not sent to Williamson, and none of the senders or recipients of the e-mail message were supervisors of Williamson.

Williamson argues that, nevertheless, his "exposure to the ebonics message changed his work environment because it made him suspicious of everyone at the bank. He did not know where harm could come to him and he was uncomfortable with this feeling." Pl. Mem., at 22. Other than this amorphous and non-specific subjective feeling, Williamson raises only two complaints emanating from the e-mail. First, he objected to being required to communicate on a temporary basis with Susan Ravkin, in June 1997 (six months after the e-mail was disseminated), "knowing that this was the person that had sent [this] racist Citimail." (Williamson Dep. at [*41] 387.) Williamson was only assigned to work with Ravkin because one of his supervisors went on vacation, and Ravkin covered for him. (Williamson Dep. at 382.) Williamson admitted that there was nothing about the way Ravkin interacted with him that bothered him. Rather, "just the fact that I had to interface with her was a problem," and having to communicate with her caused him stress and headaches. (Williamson Dep. at 389-390.)

Second, Williamson contends that Robert Ferazi, a recipient of the e-mail, made an "offensive" comment to him by asking: "How did you [Williamson] find a special tool...when you said you didn't even know what it was?" (Williamson Dep. at 371.) Williamson found this question offensive because he believed that Ferazi was questioning his integrity. (Id.)

For the same reasons discussed with respect to Brenda Curtis, Williamson's uncomfortable feeling about the e-mail, and the two innocuous incidents he relates to the e-mail, are insufficient to demonstrate a workplace permeated with discriminatory animus. Moreover, as discussed above, Citibank took prompt and comprehensive corrective action in response to the e-mail, and therefore, there is no basis for imputing [*42] liability to Citibank for the e-mail.

Williamson further alleges that during the course of his five and a half year tenure at Citibank, he heard several racist or discriminatory comments. In 1993 or 1994, a computer operator asked him if he knew what a "moule" was. (Williamson Dep. at 304-306.) [9] Williamson also alleges that he once overheard an employee who was complaining of overwork refer to himself as a "whipping boy." (Williamson Dep. at 307.) Williamson further alleges that he once overheard an employee answer "yes, sir," in response to another employee who asked him to do something. (Williamson

1999 U.S. Dist. LEXIS 23047, *42
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

Dep. at 307, 348.) Williamson also once overheard a conversation among other employees about a news story involving a Hispanic person choked by a police officer, and heard one of the participants in the conversation say that "at least these people don't riot like Blacks do." (Williamson Dep. at 308, 351.) Finally, Williamson alleges that he overheard his Human Resources representative, Adrienne Sogno, tell a Caucasian employee, "If you do that again, you'll get lynched." (Sogno Aff., at P 11.) [10]

    9    Although not commonly used, this is apparently a racially derogatory term.

[*43]
    10    Williamson further alleges that after the present action had been filed and became public, a Citibank employee, Stephen Williams, contacted him to tell him that he had once found a piece of paper on his desk which said "die nigger, die," and that therefore, he feared for his life. (Williamson Dep. at 31-32.) Plaintiff acknowledged at his deposition that he did not know which department Williams worked in. (Williamson Dep. at 32.) Plaintiff further admitted that he had no other conversations with Williams about the note. (Williamson Dep. at 34.) Williamson's allegation that another African-American employee, with whom he did not work, informed him of a racist threat, does not support Williamson's claim that he was subject to a hostile work environment at Citibank. Moreover, plaintiff's allegation that a co-employee told him of a racist note is hearsay, and the Court cannot properly consider it in assessing his claim of a hostile work environment. See Ad/SAT Division of Skylight, Inc. v. Associated Press, 181 F.3d 216, 236 (2d Cir. 1999); Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999); cf. Rizzo-Puccio v. College Auxiliary Services, Inc., 71 F. Supp. 2d 47, No. 98- CV-0741, 1999 WL 965695, at *8 (N.D.N.Y. Oct. 8, 1999)(refusing to consider plaintiff's deposition testimony that other employees allegedly told her that the defendant had treated them poorly, because it was inadmissible hearsay); Baura v. Credit Lyonnais-U.S. Branches, 1998 U.S. Dist. LEXIS 20338, No. 97 Civ. 7991 (JSR), 1998 WL 915892, at *4 (S.D.N.Y. Dec. 30, 1998)(refusing to consider as part of hostile work environment

claim comments directed at other employees, where evidence plaintiff proffers is wholly conclusory).

    [*44] Furthermore, Williamson contends that he was subject to a hostile work environment and disparate treatment from his supervisor, Rosemarie O'Connors. Williamson alleges that in January 1995, O'Connors complained that when she asked him questions, he responded "huh," which Williamson took to imply that he was dumb, although he concedes that he does not believe the comment was meant to be racist or malicious. (Williamson Dep. at 355.) Williamson further alleges that O'Connors addressed her white employees in mild tones, but that she spoke in hostile and aggressive tones to both him and another African-American employee. (Williamson Dep. at 355.)

    Including the e-mail, which was not even sent to Williamson, and which he only learned about when Curtis showed it to him, Williamson alleges that he either overheard or was the target of seven comments or insults having racial overtones during his five and a half years as an employee at Citibank. [11] As discussed above, as a matter of law, this is insufficient to establish a pervasive pattern of hostile and discriminatory incidents necessary to establish a hostile work environment claim.

    11    In their Memorandum of Law, plaintiffs appear to argue that Williamson was placed on a final warning by Greg Lutfey, and that this is further evidence of a racially hostile work environment. See Pl. Mem., at 28. Although plaintiff appears to argue that he was placed on a final warning by Lutfey, the only evidence in the record of a final warning for Williamson is one given to him by Frank Iaria, which is discussed below. There is evidence in the record of a performance evaluation of Williamson prepared by Lutfey. Williamson does not allege that Lutfey discriminated against him in any other way or treated him in a hostile or derogatory fashion; in fact, one of his complaints is that Lutfey had very little contact with him during the period of time prior to the evaluation. Although Williamson noted in response to the evaluation that he believed it to be "grossly fabricated as part of a classical case of harassment," there is nothing beyond Williamson's conclusory assertions of discrimination that support his claim that it was

based on discrimination. *See* Williamson Performance Review, dated 2/3/97, attached as Ex. 7 to Plevan Aff.

On its face, there is nothing objectively racially hostile about the evaluation. Accordingly, there is no basis for the Court to conclude that this review contributed to a racially hostile work environment at Citibank. Moreover, this performance review could not be the basis for a disparate treatment claim, because Williamson has not demonstrated that the performance review caused a materially adverse change in the conditions of his employment. *See Valentine v. Standard & Poor's*, 50 F. Supp.2d 262, 284 (S.D.N.Y. 1999).

[*45] Moreover, most of these six or seven comments fail to meet the objective element (and some also arguably fail to meet even the subject element) of a hostile work environment claim. Williamson acknowledges that when O'Connors complained to him about his answering questions with "huh," he did not believe the comment was meant to be racist or malicious, despite the fact that he thought that it may have reflected a stereotype of African-Americans as dumb. (Williamson Dep. at 355.) Williamson, however, does not allege that O'Connors ever called him dumb or in any way indicated that she questioned his intelligence. A supervisor's stating an objection to his saying "huh" conveys no objective racial hostility, and Williamson himself concedes that he did not necessarily perceive that it did. This comment thus fails to rise to the level of an objective racially hostile incident.

Similarly, Williamson does not identify any racial component to Ferazi's question about Williamson's finding a computer tool. There is no objective racial connotation to Ferazi's asking Williamson how he had gotten the necessary tool, when Williamson had earlier told Ferazi that he did not even know what he needed. [*46] Williamson's subjective belief that because Ferazi had received the e-mail, this comment was motivated by racial animus, does not transform this into an actionable racially hostile comment. Moreover, while the overheard comments of another employee referring to himself as a "whipping "boy," in complaining about his work assignments, may have a racial association for plaintiff, there is no evidence that it was directed at plaintiff or intended to be racially hostile or offensive. The same can

be said of a co-employee's response to another person of "yas, sir" to a work assignment, and of Sogno's saying to another employee, who was Caucasian, that he could get lynched if he repeats his behavior. Assuming these speakers had reason to know that Williamson was listening, which has not been established, at most these comments could be considered insensitive, rather than racially hostile.

In sum, assuming the truth of Williamson's allegations, no reasonable jury could conclude that his being made aware of the e-mail, and his overhearing these isolated, ambiguous comments, over a five and a half year period, so "permeated" his work environment with racial hostility so as to rise to the level [*47] of a hostile work environment actionable under Title VII. *Cf. Arroyo v. Westlab Administration, Inc.*, 54 F. Supp.2d 224, 230 (S.D.N.Y. 1999)(granting summary judgment where plaintiff identified only five or six incidents of racial animosity over the course of two years); *Shabat v. Blue Cross Blue Shield*, 925 F. Supp. 977, 982-983 (W.D.N.Y. 1996)(holding that several incidents of racially discriminatory conduct over a three and one half year period, separated by a month or more, were too infrequent to support plaintiff's claim of a hostile work environment); *Christoforou v. Ryder Truck Rental, Inc.*, 668 F. Supp. 294, 301 (S.D.N.Y. 1987)(holding that three incidents of sexual harassment over a one and one-half year period was too sporadic to show a hostile work environment).

In any event, even were Williamson able to establish that the sporadic offensive comments he overheard were sufficient to establish a claim for a hostile work environment, there is no basis for imputing liability to Citibank for these comments. The only comments cited by Williamson that had even a remotely objective racial quality to them were made by co-employees, [*48] and not by his direct supervisors. Accordingly, Citibank can only be liable for such comments if plaintiff proves that either the employer provided no reasonable avenue for complaint or knew of racial harassment but did nothing about it. *See Karibian*, 14 F.3d at 780. [HN9]The employer's promulgation of an anti-harassment policy with a complaint procedure is "an important, if not dispositive, consideration" in evaluating employer liability. *See Fierro v. Saks Fifth Avenue*, 13 F. Supp.2d 481, 491 (S.D.N.Y. 1998); *Franklin*, 1999 U.S. Dist. LEXIS 15582, 1999 WL 796170, at *8. Citibank has presented undisputed evidence that it had an

1999 U.S. Dist. LEXIS 23047, *48
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

anti-harassment and discrimination policy in effect, which advised all employees in its employee guide that if an employee has a complaint, he should discuss it with his supervisor, another manager, or directly with Human Resources. *See* Citibank Human Resources Policy, attached as Ex. 4 to Jensen Aff. Moreover, it is undisputed that Citibank provided plaintiff with remedial procedures that he chose not to pursue. Williamson acknowledged that he never pursued Citibank's available avenues for redress, indicating with respect to at least one [*49] of the comments that he "felt so embarrassed by the statement that I couldn't even get myself to mention it to anyone else," and with respect to the "yes, sir" comment that "I really wouldn't want to even repeat [it] to anyone. I just internalized it and just thought about what happened." (Williamson Dep. at 346, 349, 352-354.) With respect to the comment about Blacks rioting, Williamson stated that he did not report it because "I like to keep peace." (Williamson Dep. at 353.) Williamson further testified that he did not tell Human Resources about any of these comments because he did not believe that anything would be done to address them. (Williamson Dep. at 353.) Nor did Williamson complain to anyone about being assigned to work with Ravkin. (Williamson Dep. at 382.) Williamson's distrust of Human Resources because of rumors he had heard that Human Resources had failed to respond to the complaints of other African-Americans, cannot serve to impose liability on Citibank for acts of which it did not know. Because Citibank as an institution was never informed of these incidents and Williamson failed to utilize available avenues to redress his complaints, when Williamson acknowledged [*50] that such avenues existed, Citibank cannot be liable for statements made by co-workers. *Cf. Lara v. The City of New York, 1999 U.S. Dist. LEXIS 9740*, No. 97 Civ. 7663 (DLC), 1999 WL 459803, at *7 (S.D.N.Y. June 29, 1999)(granting summary judgment on hostile work environment claim where plaintiff failed to utilize complaint procedures because he believed that complaining would not "'accomplish anything'"); *Hylton v. Norrell Health Care of New York, 53 F. Supp.2d 613, 618 (S.D.N.Y. 1999)*(holding that generalized fears related to informing an employer of harassment do not constitute reasonable grounds for failure to raise a complaint with plaintiff's employer); *Franklin, 1999 U.S. Dist. LEXIS 15582, 1999 WL 796170*, at *8 (dismissing plaintiff's claim of hostile work environment where plaintiff did not report alleged harassing conduct because she believed that there was no one to whom she could complain, and holding as a matter of law, that this excuse

is not valid); *Fierro, 13 F. Supp.2d at 491* (holding that as a matter of law, plaintiff's generalized fears of repercussions and of an unpleasant outcome do not constitute reasonable grounds for an employee's failure to complain [*51] to his employer).

Because no reasonable juror could conclude that Williamson's unexpressed offense at a limited number of isolated comments and incidents, some not even objectively racial in character, and all but two of which were not even directed at him, is sufficient to impose liability on Citibank for a workplace permeated with discriminatory hostility or intimidation, I respectfully recommend that summary judgment be granted with respect to Williamson's hostile work environment claim.

### III. Disparate Treatment and Retaliation

[HN10]The standards for adjudicating a Title VII disparate treatment claim are well established. The plaintiff bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973)*; *Chertkova v. Connecticut General Life Insurance Co., 92 F.3d 81, 87 (2d Cir. 1996)*; *Fisher v. Vassar College, 70 F.3d 1420, 1433 (2d Cir. 1995)*. Although the plaintiff's initial burden in establishing a *prima facie* case of discrimination is minimal, it is not entirely without substance. [*52] *See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993)*; *Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994)*; *Chertkova, 92 F.3d at 90*. To satisfy his or her initial burden, a plaintiff alleging unlawful disparate treatment must demonstrate that: (1) he or she is a member of a protected class; (2) he or she was qualified for the position for which he or she was not hired or, as alternatively described by some courts, he or she satisfactorily performed the duties required by his or her position; (3) he or she suffered an adverse employment action; and (4) the adverse action occurred in circumstances giving rise to an inference of discrimination on the basis of his or her membership in that class. *See Austin v. Ford Models, Inc., 149 F.3d 148, 152 (2d Cir. 1998)*; *Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)*; *accord Spence v. Maryland Cas. Co., 995 F.2d 1147, 1155 (2d Cir. 1993)*; *see also Song v. Ives Labs., Inc., 957 F.2d 1041, 1045 (2d Cir. 1992)*; *Lopez v. Metropolitan Life Ins. Co., 930 F.2d 157, 161 [*53] (2d Cir.), cert. denied, 502 U.S. 880,*

1999 U.S. Dist. LEXIS 23047, *53
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

112 S. Ct. 228, 116 L. Ed. 2d 185 (1991).

[HN11]To establish a *prima facie* case of retaliation, a plaintiff must show: (1) that he was engaged in protected activity under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) a causal connection between the adverse activity and the protected activity. *See Sumner v. United States Postal Services, 899 F.2d 203, 208-209 (2d Cir. 1990); accord Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993).* "In determining whether the plaintiff has met the de minimis initial burden of showing 'circumstances giving rise to an inference of discrimination,' the function of the court on a summary judgment motion is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.'" *Cronin, 46 F.3d at 204* (quoting *Chambers, 43 F.3d at 38*). [*54] However, "conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(c)." *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S. Ct. 91, 88 L. Ed. 2d 74 (1985); accord Carter v. AT&T Communications, 759 F. Supp. 155, 160 (S.D.N.Y. 1991).*

[HN12]Once a plaintiff has established a *prima facie* case, a presumption of discrimination arises, *Chertkova, 92 F.3d at 87*, and the burden shifts to the defendant, who must then show that "a legitimate, nondiscriminatory reason" exists for the alleged adverse employment action." *McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; accord Chertkova, 92 F.3d at 87*. The defendant need not prove by a preponderance of the evidence that the reasons for its actions were not unlawful, since the burden of persuasion remains with the plaintiff throughout the case; the defendant must simply articulate the existence of a nondiscriminatory reason. *See Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-58, 101 S. Ct. 1089, 1094-96, 67 L. Ed. 2d 207 (1981); [*55] Fisher, 70 F.3d at 1433.* This articulation must be clear and specific. *See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1226 (2d Cir. 1994).*

If the defendant presents legitimate reasons for its actions, the plaintiff must then carry the ultimate burden of persuasion as to the fact of intentional discrimination,

i.e., that race or another protected status was a determinative factor motivating the employer's conduct. *See Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Burdine, 450 U.S. at 252-53, 101 S. Ct. at 1093-94; McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. at 1825; Bickerstaff, 196 F3d 435, 1999 WL 1038283, at *8-9; Fisher, 70 F.3d at 1433.* However, while a plaintiff cannot carry his burden by showing pretext alone, disbelief in the employer's nondiscriminatory justification, together with the elements of the plaintiff's *prima facie* case or other proof offered by the plaintiff, may be sufficient to permit an inference of discriminatory motivation. *See Hicks, 509 U.S. at 511, 113 S. Ct. at 2749; Murray v. United Parcel Service, 1995 U.S.Dist. LEXIS 16986, No. 92 Civ. 2448 (LAP), 1995 WL 678389, [*56] at *4 (S.D.N.Y. Nov. 15, 1995).*

### A. Brenda Curtis' Claims of Disparate Treatment and Retaliation

#### 1. Enforcement of Workplace Policies

Curtis alleges that her supervisor, Mary Scott, discriminated and retaliated against her by imposing rigid workplace rules that altered the conditions of her employment. (Curtis Dep. at 438, 502-505, 509.) Curtis alleges that Scott deprived her of the opportunity to work overtime, limited her lunch break to one hour, required that she notify a supervisor if she would be away from her desk for more than fifteen minutes, and criticized her for arriving at work after 9:00 a.m. Curtis alleges that she had not been subject to these workplace rules prior to commencing the present action, and that other administrative assistants were not subject to these rules.

As an African-American woman, Curtis has established membership in a protected class, the first element of a *prima facie* case of disparate treatment. Her qualifications for her position (the second element of a *prima facie* case) are not at issue as part of her claim of discriminatory enforcement of workplace rules. Curtis alleges that she had often worked overtime, thereby earning additional [*57] income and allowing her to complete her work. She further alleges that she had previously enjoyed flexibility with respect to her working hours. Because one of the reasons for her placement on final warning and her termination was her chronic tardiness, and because her inability to work overtime deprived her of additional income, Curtis has established that the enforcement of these workplace rules constituted adverse employment actions sufficient to establish the

1999 U.S. Dist. LEXIS 23047, *57
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

third factor of the *prima facie* case.

[HN13]To establish that the enforcement of the workplace policies gives rise to an inference of discrimination, the fourth element of a *prima facie* case of disparate treatment, Curtis must show that she was treated differently from similarly situated co-workers because of her race. *See Shumway v. United Parcel Service, Inc., 118 F.3d 60, 63 (2d Cir. 1997).* To be similarly situated to the plaintiff, other employees must report to the same supervisor as the plaintiff, and be subject to the same standards governing performance, evaluation and discipline. *See Alston v. New York City Transit Authority, 1999 U.S. Dist. LEXIS 11376,* No. 97 Civ. 1080 (RWS), 1999 WL 540442, at *5 (S.D. [*58] N.Y. July 26, 1999); *Davis v. Pitney Bowes, 1997 U.S. Dist. LEXIS 16258,* No. 95 Civ. 4765 (LAP), 1997 WL 655935, at *19 (S.D.N.Y. Oct. 20, 1997), *aff'd. 159 F.3d 1346 (2d Cir. 1998); Francis v. Runyon, 928 F. Supp. 195, 203 (E.D.N.Y. 1996); Gilman v. Runyon, 865 F. Supp. 188, 192 (S.D.N.Y. 1994); Mazella v. RCA Global Communications, Inc., 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986), aff'd without op., 814 F.2d 653 (2d Cir. 1987).* For a claim of selective enforcement of workplace rules or policies to reach a jury, a plaintiff must come forward with evidence consisting of more than mere conclusory or unsubstantiated statements. *See Henry v. Daytop Village, 42 F.3d 89, 96 (2d Cir. 1994)(citing Meiri, 759 F.2d at 998).*

Curtis began working for Scott in January 1997. Curtis alleges that prior to working for Scott, she had never been subjected to such rigid workplace rules. However, the mere fact that these workplace rules were enforced at the time Curtis began working for Scott does not give rise to an inference of discrimination; rather, it strongly suggests that the enforcement of these [*59] rules was Scott's managerial style. [12] The sole relevant inquiry is whether Scott enforced these rules against Curtis, and not against other similarly situated co-workers of Curtis, whom Scott also supervised. In fact, the record demonstrates that in March 1997, Scott sent an e-mail to all of the administrative assistants whom she supervised, which set forth applicable workplace policies. The e-mail stated that the administrative assistants were to: 1) submit time sheets on a weekly basis, 2) take only one hour for lunch, 3) obtain preapproval from their manager for any overtime, and 4) leave a note if leaving their desk for more than fifteen minutes, except for lunch. *See* E-mail from Mary Scott, dated March 3, 1997, attached as Ex. 1

to Scott Decl.

12   The Court notes that Curtis accuses Scott of discriminating against her because she imposed stricter work rules than her other supervisors, while she also accuses her other supervisors, Elliot Conway and Ravi Apte, of subjecting her to racially and sexually offensive conduct.

[*60] Scott also spoke with Curtis to discuss with her the requirement that Curtis arrive at work by 9:00 a.m. (Scott Decl., at P 16.) Curtis does not allege that other administrative assistants supervised by Scott were permitted to report to work at a later time. Accordingly, Curtis cannot establish a *prima facie* case of discrimination with respect to this requirement. *Compare Bass v. Chemical Banking Corporation, 1996 U.S. Dist. LEXIS 9228,* No. 94 Civ. 8833 (SHS), 1996 WL 374151, at *7 (S.D.N.Y. July 2, 1996)(denying summary judgment where there was evidence in the record that no other similarly situated employees were required to have their absences pre-approved, as plaintiff was).

Curtis does allege that she saw another administrative assistant take a two-hour lunch. (Curtis Dep. at 511.) However, Curtis fails (1) to identify this other employee, (2) to indicate whether Scott was also her supervisor, (3) to assert whether that employee had obtained permission for the extended lunchtime, and (4) to indicate whether Curtis herself had ever requested and been denied an extended lunchtime. [13] Thus, Curtis has failed to show that this co-worker was similarly situated, or to come forward with [*61] any evidence indicating that similarly situated co-workers were allowed more lenient lunch rules than she was. *Cf. Marks v. National Communications Association, Inc., 72 F. Supp. 2d 322,* No. 95 Civ. 9727 (PKL), 1999 WL 974022, at *8 (S.D.N.Y. Oct. 26, 1999)(holding that plaintiff's inability to identify any specific employees treated differently than her leaves her incapable of establishing that she was similarly situated); *Bennett v. Morgan Stanley & Co., Inc., 1999 U.S. Dist. LEXIS 3552,* No. 96 Civ. 6071 (AGS), 1999 WL 165713, at *5 (S.D.N.Y. March 25, 1999)(holding that plaintiff failed to show that he was similarly situated to other employees who were allegedly subject to different standards regarding discipline and evaluations, where plaintiff came forward with no evidence that he reported to the same supervisor as the other employees); *Porras v. Montefiore Medical Center, 742 F. Supp. 120, 126 (S.D.N.Y. 1990)(dismissing*

1999 U.S. Dist. LEXIS 23047, *61
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

plaintiff's claim because she could not identify any employees with similar work records who were treated more favorably).

    13    Curtis cites this other administrative assistant's two-hour lunch in response to an incident on May 1, 1997 when Curtis had asked Scott's permission to leave work one hour early, telling Scott that she would work through lunch in order to make up the time. (Scott Decl., at P 19; Curtis Dep. at 450.) Curtis states that she left her desk for about twenty minutes to buy lunch and that Scott yelled at her for leaving her desk for twenty minutes without leaving a note, because Scott thought that Curtis had indicated that in exchange for permission to leave early, she would not take lunch. (Curtis Dep. at 450.) Curtis explains that she had meant that she would eat at her desk, but not that she had offered to forego eating lunch. (Curtis Dep. at 450.) Curtis does not indicate how another administrative assistant's two-hour lunch break has any relation to this incident. If anything, the fact that Scott allowed Curtis to forego lunch in order to leave early indicates Scott's flexibility in enforcing the time rules with respect to Curtis.

[*62]  Curtis also alleges that Scott selectively enforced her rules about overtime. Curtis contends that Scott told her that there was no room in the budget for overtime. (Curtis Dep. at 438.) When Curtis then observed two co-workers, Rosa Rodriguez and Evelyn Tinsley, working overtime, she spoke to Scott about it. (Curtis Dep. at 438.) Scott then explained that their managers had approved the overtime, and that preapproval of any overtime work was necessary for budgeting purposes. (Curtis Dep. at 439.) There is nothing in the record which indicates whether these administrative assistants had the same job duties as Curtis, or whether Ravi Apte, Curtis' manager, was also their manager. Curtis also does not allege that they were able to work overtime without preapproval, thereby undermining her argument that there was discriminatory enforcement of the policy requiring preapproval for overtime work. Cf. *Henry, 42 F.3d at 97* (affirming summary judgment on claim that similarly situated white or male employees were treated more favorably because plaintiff failed to corroborate allegation that other employees received different treatment for similar conduct and failed to even [*63] show that these

employees were similarly situated).

    In any event, Scott informed Curtis that she believed that Curtis could complete all of her work without utilizing overtime, based in part on the fact that Curtis' predecessor, Sharon Kearney, had been able to complete the same assignments without putting in overtime. Although Curtis argues that her predecessor did not work overtime because she chose not to do so, Curtis does not dispute that her predecessor may have been able to complete the tasks within the normal workday. (Curtis Dep. at 440.) Since her similarly situated predecessor was able to complete the work without overtime, Scott's statement that she believed that Curtis could also do so does not give rise to an inference of discrimination, even if Curtis could establish that other administrative assistants in Scott's department were granted preapproval for overtime and Curtis was not. [14]

    14    It is unclear from the record whether Curtis ever even requested preapproval for overtime. She states in her deposition that "I have never asked anybody can I stay to do overtime," although she may have been referring to the time prior to working for Scott. (Curtis Dep. at 441.) Curtis states that she had three conversations with Scott about overtime work, and that Scott told her that Curtis could complete her job within the normal workday, although it is unclear whether or not Curtis actually requested preapproval to work overtime. (Curtis Dep. at 505.) Curtis further states that Scott was unclear, but that she never stated that Curtis could not work overtime. (Curtis at 509.) Scott states that she never prohibited any staff member from working overtime in 1997. (Scott Decl., at P 14.)

[*64]  Most significantly, Curtis has not come forward with any evidence that the overtime policy was applied in a racially discriminatory manner. Rather, when asked at her deposition if she had any reason to believe that the rules about overtime were related to race, Curtis responded that the entire support staff consisted of minorities, and that her main objection to the policy was that she had never experienced Scott's management style before because, in her other positions at Citibank, no supervisory approval had been required for overtime work. (Curtis Dep. at 439-441.) Accordingly, Curtis has failed to establish a *prima facie* case of discrimination with respect to Scott's enforcement of workplace rules.

Nor has Curtis come forward with any evidence that Scott's enforcement of these workplace rules and policies constituted retaliation against her for filing this action. As discussed above, the enforcement of these policies coincided with the commencement of Scott's supervision of Curtis. There is no evidence that Scott treated Curtis differently prior to her filing this action, and there is no evidence in the record that Scott selectively enforced these policies against Curtis, [*65] but not against other similarly situated employees whom she supervised. Therefore, there is no evidence from which a jury could reasonably infer that the enforcement of these policies, to which Curtis objects primarily because they had not previously been enforced by her other supervisors in other departments, was in retaliation for Curtis' reporting of the "ebonics e-mail" or her filing of the present action. Accordingly, just as Curtis has failed to establish a *prima facie* case of disparate treatment with respect to Scott's enforcement of workplace rules, Curtis has failed to establish a *prima facie* case of retaliation.

I therefore respectfully recommend that defendants' motion be granted with respect to Curtis' allegations of discrimination with respect to the enforcement of workplace rules.

### 2. Lack of Supervisory Duties

Curtis also contends that Scott deprived her of the opportunity to supervise the other administrative assistants in her department, while Curtis' Caucasian predecessor, Sharon Kearney, had done so. (Curtis Dep. at 309-313.)

At the time that Curtis transferred to GTI and began working for Scott, she had received favorable performance reviews and merit [*66] based salary increases, including a review suggesting that she receive training in supervising administrative staff. *See* Performance Appraisal Report. Therefore, because Curtis has established both her membership in a protected group and her qualifications for the position, she has satisfied the first and second elements of her *prima facie* case.

However, Curtis is unable to establish the remaining elements of a *prima facie* case of discrimination, namely that her failure to be given supervisory responsibility occurred under circumstances giving rise to an inference of discrimination, or even that an adverse employment action was taken. Although Curtis alleges that during her interview with Human Resources to become Ravi Apte's administrative assistant, she was told she would have supervisory duties, she acknowledges that when she initially interviewed for the position with Apte, there was no discussion as to whether or not she would have any supervisory responsibilities. (Curtis Dep. at 311-312.) Moreover, Curtis concedes that when she initially met with Scott, Scott told her that Curtis would supervise the other administrative assistants, and Curtis responded, "I'll not [*67] do it unless I had it in writing." (Curtis Dep. at 309-313). Although Curtis now explains that her statement that the supervisory duties should be in writing was meant to avoid any confusion as to the nature of her responsibilities, (Curtis Dep. at 309-313), even drawing all inferences in her favor for the purposes of summary judgment, there is no evidence that Scott was unwilling to give Curtis supervisory duties. Rather, after being offered supervisory responsibilities by Scott, Curtis created the impression that she was placing further demands on Scott or was reluctant to accept supervisory responsibilities. (Transcript of Deposition of Mary Scott ("Scott Dep.") at 152-155, excerpts attached as Ex. K to Mitchell Aff.) Curtis does not allege that she subsequently spoke with Scott, asking for the written statement that she would be a supervisor, or that she in any other way pursued securing this responsibility. Rather, she merely notes that she never heard about the issue again. (Curtis Dep. at 313.) Given that Scott offered her those duties, and that Curtis' own statements suggested a reluctance to assume supervisory duties, there is no basis on which a jury could reasonably conclude [*68] that Curtis' failure to assume a supervisory role arose in circumstances giving rise to an inference of discrimination. Curtis has thus failed to satisfy the fourth element of a *prima facie* case of discrimination.

Even assuming, arguendo, that Curtis has established a *prima facie* case of discrimination, defendants have offered a legitimate and nondiscriminatory reason for their actions. It was Scott's belief that Curtis indicated to her, by her statement, that she was not interested in assuming supervisory duties. (Scott Dep. at 153-155.) Because Curtis' own account of her statements to Scott suggested a reluctance to assume supervisory duties, there is nothing in the record to suggest that Scott's explanation for why Curtis was not given supervisory duties was not the real reason she was not given the duties. It follows that no reasonable jury could conclude that Curtis has met her burden of proving that defendants' explanation was merely a pretext for discrimination.

Curtis has also failed to establish either a *prima facie* case of retaliation, or that Scott's stated reason for not giving Curtis supervisory duties was a pretext for retaliation. [15] Plaintiff has shown [*69] no connection between the filing of this action and her failure to obtain supervisory responsibilities, other than their purely coincidental proximity in time. Curtis transferred to Scott's department within days of filing the present action. Upon her transfer, she and Scott discussed her duties in her new position. Therefore, the mere fact that this discussion about whether she would have supervisory duties occurred soon after the filing of the present action proves nothing with respect to retaliation, since it coincided with her transfer to Scott's department.

> 15    Plaintiffs' Memorandum of Law contains only one paragraph, with no citations to any facts in the record or case law, arguing that Curtis was denied supervisory duties in retaliation for complaining about the e-mail and filing this action. Plaintiffs' attorney fails in any way to articulate a connection between the alleged adverse employment action and the filing of the present action, except to state that "after she filed her lawsuit she was denied the position of supervisor." Pl. Mem., at 30.

[*70]    Moreover, as discussed above, plaintiff has come forward with no evidence to show that Scott's stated reason for not giving Curtis supervisory duties was in any way a pretext for retaliation. Rather, the evidence shows that Scott offered Curtis the opportunity to supervise, and that Curtis imposed conditions on her acceptance of that responsibility in a manner suggesting a reluctance to assume such duties. (The explanation Curtis now offers of what she meant in her statement to Scott, was never given to Scott.) Thereafter, Curtis failed to pursue supervisory duties, or a statement of her responsibilities in writing. Accordingly, there is no basis from which a rational juror could reasonably infer that Scott's explanation for the reason that Curtis did not have supervisory duties -- namely her belief that Curtis was not interested in them -- was merely a pretext for retaliation.

Accordingly, I respectfully recommend that summary judgment be granted with respect to Curtis' claims of disparate treatment and retaliation as they relate to her being denied supervisory responsibilities.

*3. Final Written Warning and Termination*

With respect to her termination, Curtis has clearly satisfied [*71] factors one and three of a *prima facie* case of discrimination: as an African-American and a woman, she is a member of a protected class, and she was placed on a final warning and then terminated, thereby suffering an adverse employment action. Nevertheless, plaintiff has not satisfied the other elements of a *prima facie* case of discrimination.

Curtis argues that her performance did not merit a final written warning or her ultimate termination, citing her prior merit-based salary increases and positive performance reviews. Defendants contend that because of problems with Curtis' performance, her chronic lateness, and her unprofessional conduct, Scott gave her a verbal warning to improve in May 1997. (Scott Decl., at P 21.) Curtis does not dispute that prior to her placement on final written warning, she had refused to perform tasks that she was told were part of her work responsibilities, because she believed that she should not have been required to do them. (Curtis Dep. at 567-570.) Plaintiff also does not dispute defendants' contention that despite an accommodation made in her starting time (moving her starting time from 9:00 a.m. to 9:30 a.m., at her and her doctor's request), [*72] Curtis continued to be chronically late for work, reporting after the 9:30 a.m. start time eleven times in a three-week period. *See* Def. Rule 56.1 Statement, at PP 95, 98, 100; Curtis Time Sheets, attached as Ex. 1 to Declaration of Tracy Boyle in Support of Defendants' Motion for Summary Judgment. Because of her chronic tardiness and her performance problems, Curtis was issued a final written warning on July 30, 1997. *See* Corrective Action Warning Form, dated July 30, 1997, attached as Ex. 1 to Declaration of Stephen Cronin in Support of Defendants' Motion for Summary Judgment ("Cronin Decl."). The final written warning indicated that Ravi Apte's calender had many errors, that there were problems with the quality of her work, that she missed work deadlines, and that she refused to do the GTI newsletter, which was one of her assignments. *See id.* A Human Resources officer then met with Curtis twice in September 1997 to reiterate the need for her to improve her performance, and the consequences of her failure to do so. (Cronin Decl., at PP 17-18.) Curtis' tardiness continued, and she reported to work late thirty-five times between October 1997 and February 1998. *See* Def. [*73] Rule 56.1 Statement, at PP 95, 98, 100; Curtis Time Sheets. Curtis was terminated on March 3, 1998. (Apte Dep. at 122.)

1999 U.S. Dist. LEXIS 23047, *73
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

Curtis does not dispute that defendants found deficiencies in her performance. Rather, she appears to argue that her prior positive performance evaluations, the effects of her stress medication, and her distress over working in proximity to a sender of the "ebonics e-mail" excuse her poor performance. *See* Pl. Mem., at 25-26. Plaintiff's prior positive performance evaluations in a different position, under a different supervisor, however, have no bearing on whether her performance was satisfactory when she was working in a different department under Scott. *Cf. Taylor v. Polygram Records, 1999 U.S. Dist. LEXIS 2583, 1999 WL 124456*, at * 14 (previous evaluations in a different department offer little probative value regarding the legitimacy of subsequent evaluations in a different position); *Orisek v. American Institute of Aeronautics and Astronautics, 938 F. Supp. 105, 191 (S.D.N.Y. 1996)*(where first negative evaluation was in a different environment, with a different manager, with different expectations, there is no evidence of pretext or discrimination); [*74] *Beers v. NYNEX Material Enterprises Co., 1992 U.S. Dist. LEXIS 240*, No. 88 Civ. 0305 (MBM), 1992 WL 8299, at *11 (S.D.N.Y. Jan. 13, 1992)("[A] new manager is allowed to appraise an employee's work according to his or her own expectations even if those expectations are contrary to a prior manager's expectations"). Nor does Curtis offer any evidence to support the conclusory assertion that Susan Ravkin's presence in her area justified her poor performance, or even had an impact on her work performance. In fact, Curtis acknowledged that Ravkin did not do or say anything hostile or harassing to her when she was in Curtis' work vicinity. (Curtis Dep. at 95.) As for her argument that her medication should excuse her poor performance, Curtis acknowledges that she stopped taking the medication in August 1997, approximately six months before she was terminated. (Curtis Dep. at 610.) Furthermore, her doctor's note, submitted to Citibank when she was on the medication, did not mention that the medication would in any way effect her ability to perform her job. *See* Corporate Health Services Request for Information, attached as Ex. 3 to Scott Decl. The only accommodation her doctor requested was that [*75] her working hours be changed to allow her to start at 9:30 a.m. rather than at 9:00 a.m. *See id.* Citibank followed her physician's recommendation and changed Curtis' starting time. (Scott Decl., at P 23.)

Because Curtis has failed to offer evidence from which a trier of fact could conclude that she satisfactorily performed her job under Scott's supervision, or that her placement on final warning and termination arose under circumstances giving rise to an inference of discrimination, she has failed to establish a *prima facie* case of discrimination. *Cf. Gomez v. Pellicone, 986 F. Supp. 220, 227 (S.D.N.Y. 1997)*(holding that plaintiff's chronic tardiness alone defeats her *prima facie* case of discriminatory termination); *Burrell v. Bentsen, 1993 U.S. Dist. LEXIS 18005*, No. 91 Civ. 2654 (KMW)(NRB), 1993 WL 535076, at *8 (S.D.N.Y. Dec. 21, 1993)(holding that plaintiff cannot establish satisfactory job performance because of many absences from work without authorization and "reasonably regular and predictable attendance is necessary for many [jobs]").

Even assuming arguendo that Curtis has established a *prima facie* case, defendants have more than satisfied their burden [*76] of showing some legitimate and nondiscriminatory basis for her dismissal. The undisputed errors in her work and her habitual lateness constitute legitimate and non-discriminatory reasons for issuing a final written warning and for her termination. *Cf. Thomas v. Saint Francis Hospital and Medical Center, 990 F. Supp. 81, 86-87 (D.Conn. 1998)*(holding that plaintiff's violation of employer's policies on tardiness and absenteeism were legitimate and nondiscriminatory reasons for plaintiff's termination); *Modeste v. DHL Airways, 1998 U.S. Dist. LEXIS 6571*, No. 94-CIV-3792, 1998 WL 199845, at *8 (E.D.N.Y. March 23, 1998)(holding that plaintiff's continual tardiness in reporting to work constituted a legitimate reason for employer to take disciplinary action against plaintiff). Moreover, defendants contend that Curtis became abusive in her dealings with Scott and Apte, shouting at them in public, refusing to discuss business issues with them, and calling Apte a liar. (Apte Dep. at 113-115; Scott Decl., at P 20.) *Cf. Woods v. American Stock Exchange, 1997 U.S. Dist. LEXIS 3683*, No. 95 Civ. 5646 (JSR), 1997 WL 151453, at *1 (S.D.N.Y. April 1, 1997)(holding that plaintiff's insubordination, dereliction [*77] of job responsibilities, leaving her assigned post without authorization, tardiness, and excessive absenteeism were legitimate non-discriminatory reasons for disciplining and terminating plaintiff). Plaintiff has not demonstrated that genuine issues of material fact exist by relying solely on conclusory allegations that defendant terminated her due to race or gender discrimination. *See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)*.

1999 U.S. Dist. LEXIS 23047, *77
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

Nor has Curtis offered any evidence beyond conclusory allegations of discrimination to show that her final warning and her termination constituted unlawful retaliation. As discussed above, Curtis does not dispute the problems with her job performance, which defendants assert was the basis for issuing her a final warning and for terminating her. Other than her conclusory allegations of discrimination, she has not made any showing that her poor performance and her chronic tardiness were merely pretextual reasons given for discriminatory or retaliatory motives. Accordingly, I respectfully recommend that summary judgment be granted with respect to Curtis' termination claim.

B.  Plaintiff Williamson's Claims of Disparate Treatment [*78]  and Retaliation

1. Promotion

Williamson alleges that he was denied several promotions on account of his race: (1) in January 1995, his supervisor, Rosemarie O'Connors, denied him the opportunity to apply for the position of AS-400 Project Leader; (2) after the resignation of Frank Iaria, the person hired to be the AS-400 Project Leader, O'Connors again did not recommend Williamson for the position of AS-400 Project Leader; and (3) he did not receive two other promotions on a UNIX computer platform.

On January 23, 1995, after Williamson had been at Citibank for approximately one year, he became aware that his supervisor, Rosemarie O'Connors, had posted the position of AS-400 Project Leader, and he asked her why she had failed to tell him about the position. (Williamson Dep. at 194-195; O'Connors Decl., at P 7.) Williamson alleges that O'Connors told him, "If I wanted you to know about this position, I would have told you about it." (Williamson Dep. at 194.) When Williamson asked her whether this was a position he could apply for, Williamson alleges that she stated that he lacked the necessary leadership skills, and that it was not even worth it for him to apply, because she had [*79] already identified another candidate for the position. (Williamson Dep. at 194-195.)

As an African-American, Williamson is a member of a protected class, thereby satisfying the first factor necessary to establish a prima facie case of disparate treatment. He was discouraged from seeking a promotion for which he asked to be considered, thereby arguably suffering an adverse employment action, the third factor.

There is a dispute about whether Williamson was qualified for the promotion, thus putting in issue whether he has established a prima facie case of discrimination.

Assuming arguendo that Williamson has established a prima facie case of discrimination, defendants have come forward with a legitimate nondiscriminatory reason for their failure to promote plaintiff. Defendants argue that Williamson lacked the necessary supervisory and leadership skills for the Project Leader position. (O'Connors Decl., at PP 7-8.) O'Connors contends that she told Williamson that she did not think that "he could adequately prioritize the work of the whole platform, foster teamwork within the platform and with users, or be sufficiently creative in addressing problems and devising solutions. [*80] " (O'Connors Decl., at P 7.) Moreover, O'Connors contends that she also told Williamson that he had waited until a month after the position was posted to discuss it with her, and at that point she had already identified a candidate for the position. (O'Connors Decl., at PP 6-7.)

Williamson contends that this argument is merely a pretext for discrimination. Williamson contends that he was qualified for the position, and that his technical skills were superior to those of Frank Iaria, who was hired for the position. Williamson cites to the fact that he had a master's degree and to the statements of his co-workers, Gerard Tonno and Tony Garcia, who praised his technical skills, to establish his superior qualifications for the position. (Garcia Dep. at 74; Tonno Dep. at 21-22.)

Defendants, however, do not contest plaintiff's technical skills. In fact, his performance review, prepared by O'Connors a few weeks prior to this promotion discussion, rates him as "met expectations," and notes his "good working knowledge of the AS/400 technical support functions." See Williamson Performance Review, dated January 5, 1995, attached as Ex. L to Plaintiffs' Exhibits. Nevertheless, his performance [*81] review, although generally positive, noted that he needed to be more vocal at group meetings, that he had difficulty prioritizing tasks, that he hesitated to volunteer for work outside his normal routine, and that he needed to be more multi-threaded. See Williamson Performance Review, dated January 5, 1995. Under "Leadership/Team Building," the review noted that "Alvin understands what is required to complete his tasks. He needs to be more of [a] team player in coordinating activities. Alvin needs to take a broader scope of the overall project as opposed to

1999 U.S. Dist. LEXIS 23047, *81
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

just his responsibilities." *Id.*

That defendants weighed leadership skills over technical skills in filling a managerial position does not suggest underlying discrimination. [HN14]An employer is entitled to make business decisions determining the criteria required for a position, absent discriminatory motive in selecting the criteria. *See Bickerstaff, 196 F3d 435, 1999 WL 1038283,* at *18 ("Vassar alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them"); *Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997); Cf. Lieberman v. Gant, 630 F.2d 60, 67 (2d Cir. 1980)* [*82] (holding that when a promotional decision is reasonably attributable to an honest, even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn). Williamson does not argue that requiring leadership skills was arbitrary or unreasonable, nor does he come forward with any evidence to suggest that his leadership skills were superior to those of Iaria. Williamson cites only the ambiguous testimony of his co-workers as to his leadership skills. [16] In fact, Williamson's white co-worker, Gerard Tonno, who was the only other AS-400 technical systems analyst besides Williamson, was also viewed as lacking the leadership skills necessary to assume the Project Leader position. *See* Def. Rule 56.1 Statement, at P 129.

> 16    Tonno stated that on one occasion Williamson sent a memorandum describing a password which was about to expire, and that this showed leadership and initiative by Williamson. (Tonno Dep. at 25-26.) Tonno also stated that another document written by Williamson set forth the need for contingency plans, and that distribution of this memoranda showed Williamson taking initiative and showing leadership. (Tonno Dep. at 40.) Tonno stated that he had never heard anyone complain to him about Williamson's work, although when asked whether members of the user community had ever complained about Williamson's work, he replied, "yes and no." (Tonno Dep. at 13.) Tonno also stated that he did not really observe Williamson's work. (Tonno Dep. at 22.) Garcia did not testify at his deposition to Williamson's leadership skills, but only to his technical knowledge, stating that Williamson was more technically proficient than Frank Iaria, and that Garcia would call

Williamson, rather than Iaria, when a device would fail. (Garcia Dep. at 76-77.)

[*83] As evidence that O'Connors discriminated against him, Williamson has submitted evidence that O'Connors had never promoted an African-American to a position of vice-president while she was at Citibank. Standing alone, it is difficult to draw any conclusions about O'Connors' treatment of Williamson from this fact. There is no evidence in the record with respect to African-Americans who applied for promotions under O'Connors or the circumstances surrounding her promotion decisions. In any event, defendants have come forward with evidence indicating that prior to leaving Citibank, O'Connors did recommend the promotion of an African-American to replace her. (Transcript of Deposition of Rosemarie O'Connors ("O'Connors Dep." at 77, excerpts attached as Ex. A to Mitchell Aff. and as Ex. 6 to Plevan Aff.) Williamson further claims that three African-Americans supervised by O'Connors left the bank because they believed that O'Connors behaved in a racist manner towards them. Williamson's statement is not competent evidence of other people's motivation, and is certainly not competent evidence that O'Connors actually treated these individuals in a discriminatory manner. In addition, Williamson's [*84] allegation that O'Connors yelled at him and other African-American employees, but never at white employees, is undermined by his own witness, Tony Garcia, who testified at his deposition that "she is a strict manager but I would never describe her as a racist manager." (Garcia Dep. at 56.)

Williamson has failed to come forward with any evidence beyond his own conclusory allegations of discrimination to show that O'Connors' statement that he lacked the requisite leadership skills for the Project Manager position was a pretext for discrimination. Nor has he come forward with any evidence demonstrating that he possessed leadership skills superior to those of Frank Iaria. Accordingly, I respectfully recommend that defendants' motion for summary judgment be granted with respect to Williamson's claim of discrimination by O'Connors in failing to promote him to the AS-400 Project Leader position.

Williamson also alleges that O'Connors discriminated against him in again failing to recommend him for the AS-400 Project Leader position after Frank Iaria resigned. Nevertheless, he does not dispute that because the number of AS-400 platform applications was

1999 U.S. Dist. LEXIS 23047, *84
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

diminishing, the position of Project [*85] Leader was eliminated, and other platform managers were assigned those responsibilities. *See* Def. Rule 56.1 Statement, at PP 130-133; O'Connors Decl., at P 20. Because the position was eliminated and never filled, Williamson cannot make out a claim of disparate treatment in the failure to promote him to this position. *Cf. James-Gray v. Hanes Hosiery, Inc., 1998 U.S. Dist. LEXIS 13016,* No. 95 Civ. 9950 (LMM), 1998 WL 525819, at *9 (S.D.N.Y. Aug. 21, 1998)(holding that plaintiff could not establish *prima facie* case of failure to promote where position was eliminated).

Williamson further alleges that although he interviewed for two open positions on the UNIX computer platform, he was not selected for either of them because of his race. O'Connors played no role in hiring for the UNIX positions. (O'Connors Decl., at P 23.) Moreover, there is no evidence that Williamson was even qualified for the UNIX positions he sought; rather, Williamson admitted during his deposition that he had no experience or training on the UNIX platform, and that he had purchased a manual to try to learn some of the UNIX terminology. (Williamson Dep. at 556.) Williamson has thus failed to come forward with any evidence [*86] showing either that he was qualified for the UNIX positions or that he was denied those positions under circumstances giving rise to an inference of discrimination, two of the factors a plaintiff must show to establish a *prima facie* case of discrimination. Accordingly, Williamson has failed to establish a *prima facie* case with respect to the UNIX promotion.

Assuming arguendo that Williamson has established a *prima facie* case of discrimination with respect to the positions on the UNIX platform, defendants have articulated a legitimate, non-discriminatory reason for why he did not receive the promotions -- his lack of experience on the system. Williamson states that during his interview, the interviewer indicated that he believed Williamson to be underqualified for one of the positions and overqualified for the other. (Williamson Dep. at 132.) As discussed above, Williamson does not dispute that he lacked training and experience with the system, nor has he offered any evidence of racial animus by the decision-makers. Moreover, he does not contend that he was better qualified for the positions than those who were hired for them. [17] Finally, Williamson never followed up after [*87] his interviewer had indicated that despite his belief that Williamson was not a good match for the

positions, he would have the other manager contact Williamson. Williamson never heard from the manager, and although he ran into him on the job, Williamson never initiated a conversation about the positions. (Williamson Dep. at 132-133.) Accordingly, Williamson has come forward with no evidence from which a rational juror could infer that defendants' stated reasons for denying him the UNIX positions were merely a pretext for discrimination. I therefore respectfully recommend that summary judgment be granted with respect to this claim.

17   There is no evidence in the record about the candidates chosen for the positions.

*B. Final Warning*

Williamson alleges that because of his race, Frank Iaria placed him on a final written warning. The stated reasons for the warning were plaintiff's unprofessional behavior, missing one meeting and being late for another, and failing to complete assigned tasks in a timely manner. [*88] *See* Williamson Final Warning. The final written warning indicates that Williamson was required to be present at two meetings on June 14, 1995, and that he did not attend the morning meeting and arrived at the afternoon meeting thirty minutes late. *See id.* The warning further indicates that when Iaria questioned Williamson about these meetings and indicated that he would write up Williamson for his conduct with respect to these two meetings, Williamson told Iaria, "this will go beyond Citibank. You'll be sorry, you will go down." *Id.* On June 19, 1995, Williamson was placed on final written warning, in part, for what was perceived in his comments as being unprofessional behavior. Finally, the warning cites Williamson's failure to complete two tasks due by April 13, 1995, which were not completed until the following week. [18] *Id.*

18   The Corrective Action Policy for Officers does not require progressive discipline; the first warning issued is the final written warning. *See* Corrective Action Policy for Officers, attached as Ex. 2 to Sogno Aff. This is consistent with the final warnings issued to the senders of the e-mail.

[*89] Williamson asserts that the basis for the warning was false and that it resulted from a discriminatory motive. Williamson contends that contrary to Iaria's statements, he did not miss the morning meeting on June 14, 1995. Rather, he was approximately fifteen

minutes late to the morning meeting because of a family emergency. (Williamson Dep. at 677.) Williamson contends that Iaria's statement that Williamson never reported to the meeting is false, and that in fact, Iaria was not even at the meeting when he arrived. (Williamson Dep. at 676.) Williamson also claims he was approximately fifteen minutes late to the afternoon meeting because he had not been informed by Iaria where the meeting was taking place, although Iaria had told him the information would be provided. Since he had not heard from Iaria regarding the meeting's location, Williamson had assumed that the meeting had been canceled. (Williamson Dep. at 675.) Upon being paged with the location of the meeting, Williamson went to the meeting, arriving approximately fifteen minutes after it had begun. (Williamson Dep. at 675.)

Whether Williamson missed the morning meeting and then lied about having attended it (as Iaria contends), [*90] or was merely late in arriving, and whether Williamson was only fifteen minutes rather than thirty minutes late for the afternoon meeting, are questions which the Court cannot resolve on the present motion. Nevertheless, even if plaintiff can establish that he did attend the morning meeting and that he had a valid reason for being late to the afternoon meeting, there is no evidence that Iaria's belief that Williamson missed the morning meeting resulted from discriminatory animus, except for plaintiff's own conclusory assertion, which is inadequate to defend a motion for summary judgment. *See Meiri, 759 F.2d at 998.*

Moreover, leaving aside the question of the meetings, when Williamson spoke with Iaria about the meetings, Williamson was disrespectful and unprofessional, threatening Iaria with the statement, "you'll be sorry, you will go down." Williamson does not deny that he made this threat to Iaria. Instead, after the fact, he offers an explanation for what he meant, testifying at his deposition that it expressed his intent to go to the EEOC and lodge a complaint of racial discrimination against Iaria. (Williamson Dep. at 680.) There is no basis to conclude that [*91] Iaria understood this to be the message behind Williamson's threat.

Iaria told Rosemarie O'Connors that he decided to issue the final warning because of Williamson's threatening response to his reprimand. (O'Connors Decl., at P 17.) Adrienne Sogno, Williamson's Human Resources Officer, similarly told Williamson that his

unprofessional behavior was the primary reason for his final warning. (Williamson Dep. at 680.) She investigated his claim that the warning constituted race discrimination, and found no evidence to support that claim. (Sogno Aff., at P 7.) Williamson has come forward with no evidence of any other discriminatory conduct by Iaria which would support his claim that a discriminatory motive led Iaria to issue the warning.

Iaria's belief, whether correct or not, that Williamson missed one meeting and was late to another, and Williamson's undisputed threat to Iaria and unprofessional conduct, are nondiscriminatory reasons for placing Williamson on final warning. There is no competent evidence in the record to indicate either that this was merely a pretext for discrimination or that other similarly situated employees did not receive warnings for similar behavior. [19] *Cf.* [*92] *Taylor v. Polygram Records, 1999 U.S. Dist. LEXIS 2583,* No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. March 8, 1999)(holding that where plaintiff admits incidents occurred and merely proffers explanations for them in disagreeing with supervisor's conclusions, plaintiff's subjective belief does not show that supervisor's appraisals were a sham, invented to mask discrimination); *Tramble v. Columbia University, 1999 U.S. Dist. LEXIS 1274,* No. 97 Civ. 1271 (RWS), 1999 WL 61826, at *12 (S.D.N.Y. Feb. 10, 1999)("[a] material issue of fact is not created merely because [plaintiff] disagrees with the characterization of the incident ... as an 'outburst'"). Accordingly, I respectfully recommend that defendants' motion for summary judgment be granted with respect to Williamson's warning.

19    Williamson has come forward with only conclusory assertions that when other employees missed meetings, they were not given final warnings. (Williamson Dep. at 677.) He does not identify these other individuals, nor does he provide any competent evidence to support this assertion. Moreover, he fails to address whether these individuals engaged in unprofessional behavior or threatened their supervisors. Williamson also alleges that the individuals placed on final warning by O'Connors committed more serious misconduct than he did, including misusing the e-mail system after Reed's warning, placing a Citibank business at risk, and misusing company property and time. (*See* O'Connors Dep. at 158-161.) This does not shed any light on

1999 U.S. Dist. LEXIS 23047, *92
141 L. Ed. 2d 662, ***691; 1998 U.S. LEXIS 4216

whether Williamson received disparate treatment, since he has not adduced any evidence suggesting that similarly situated employees who made threats to their superiors or engaged in unprofessional conduct, were not placed on final warning.

[*93] **Conclusion**

For the reasons set forth above, I respectfully recommend that defendants be granted summary judgment, and the action be dismissed with prejudice. Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Batts. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 149-52, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985), *reh'g denied*, 474 U.S. 1111, 88 L. Ed. 2d 933, 106 S. Ct. 899 (1986); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993), *cert. denied*, 513 U.S. 822, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994); *Frank v. Johnson*, 968 F.2d 298, 300 [*94] (2d Cir.), *cert. denied*, 506 U.S. 1038, 113 S. Ct. 825, 121 L. Ed. 2d 696 (1992); *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

THEODORE H. KATZ

UNITED STATES MAGISTRATE JUDGE

Dated: December 13, 1999

New York, New York